JOHN HOWARD BURBAGE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9095–79.     Filed March 29, 1984.

*D. Paul Alagia, Jr., Richard M. Trautwein, John E. Evans, Allan B. Solomon,* and *William C. Willock, Jr.,* for the petitioner.

*Scott R. Cox,* for the respondent.

WILES, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1972 | $51,367.27 |
| 1974 | 78,270.00 |
| 1975 | 6,205.00 |

After concessions, the issues for decision are: (1) Whether assessment of the deficiency for petitioner's 1972 taxable year is barred by the statute of limitations; (2) whether petitioner's 1972 transfer of real property pursuant to a 99-year redeemable ground rent lease constituted a taxable sale or exchange; (3) whether petitioner's 1974 transfer of the right to receive payments under 1 redeemable ground rent lease for 18 redeemable ground rent leases was a taxable event; (4) whether petitioner properly reported certain payments received in the 1974 exchange of ground rents; (5) whether Jamaica Industries, Inc., a subchapter S corporation in which petitioner is a 50-percent shareholder, received excessive passive income in 1974 which terminated its subchapter S election pursuant to section 1372(e)(5).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner resided in Berlin, Md., when he filed his petition in this case. Throughout the years in issue, petitioner was married to Rosalind A. Burbage, and he timely filed separate Federal income tax returns for 1972, 1974, and 1975 with the Internal Revenue Service Center, Philadelphia, Pa.[2]

The tax deficiencies in issue result primarily from two separate business ventures in which John Howard Burbage (hereinafter petitioner) was involved during the years in issue. For the sake of clarity, we have separately organized the facts pertaining to each of these ventures.

GROUND RENT TRANSACTIONS

### A. 1972 Maryland Ground Rent Lease

During 1969, petitioner acquired a fee simple interest in two oceanfront lots in Ocean City, Md. (hereinafter the Burbage

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2] On Apr. 4, 1979, petitioner filed an amended return for his 1975 taxable year reporting income as married filing jointly. By an amended petition dated Oct. 4, 1979, petitioner alleged that respondent erred in not sending a notice of deficiency for the 1975 taxable year to Rosalind A. Burbage and in computing petitioner's tax for 1975 as married filing separately. Respondent denied these allegations in his amended answer. Since petitioner has not raised this issue at trial or on brief, we deem petitioner to have abandoned it.

property), for $35,820.[3] At some undetermined point between 1969 and 1972, Larmar Corp. (hereinafter Larmar) began plans to build a 35-unit, $1,250,000 oceanfront condominium project called the Spinnaker Condominiums. The Burbage property was located directly between the ocean and the property on which Larmar planned to build its condominium project (hereinafter the Larmar property).

During 1972, petitioner approached Larmar and offered to sell it the Burbage property. At that time, Larmar had acquired the Larmar property and plans for the condominium project had been developed, although it is not clear whether construction on the condominiums had yet begun. Since the condominium had been advertised as an oceanfront project, Larmar recognized that acquisition or development of the Burbage property by a third party would have considerably devalued the project and may even have forced them to abandon it.

Naturally, Larmar was interested in acquiring the Burbage property, but it did not want to make an outright purchase. Instead, Larmar leased the Burbage property from petitioner under an agreement dated July 11, 1972, whose relevant terms in part provide:

SECTION 4. The term of this lease shall commence as of July 1, 1972, and unless sooner terminated (by exercise of Tenant's option of redemption pursuant to Maryland law) shall be for a period of ninety-nine (99) years, expiring June 30, 2071, without the necessity of any notice from either Landlord or Tenant to terminate the same; subject, however, to renewal forever, in accordance with Maryland law * * *

* * * * * * *

SECTION 6. * * * If Tenant shall violate any covenant, including the covenant to pay rent [$10,800 in semiannual installments of $5,400 each, in arrears], made by it in this Lease Agreement and shall fail to comply or in good faith commence compliance with said covenant within ninety (90) days after being sent written notice of such violation by Landlord, Landlord may, at his option, re-enter the premises and declare this lease and the tenancy hereby created terminated; * * * subject, however, to the provisions of Maryland law respecting the perpetual renewal of ninety-nine (99) year ground rent leases (and it is hereby covenanted and agreed by and between the parties that this Lease is a Maryland ground rent lease for ninety-nine (99) years renewable forever).

---

[3] At all relevant times, petitioner's basis in the Burbage property remained $35,820.

SECTION 7. \* \* \* Furthermore, Tenant shall have and is hereby given the unqualified right, at its option, of subletting the demised premises, or any part thereof, or of any improvements thereon, provided that Tenant shall remain liable hereunder.

\*　　\*　　\*　　\*　　\*　　\*　　\*

SECTION 9. It is covenanted and agreed that the capitalized value of this Lease is One Hundred Eighty Thousand Dollars ($180,000). \* \* \*

On the same date that petitioner leased the Burbage property to Larmar, Larmar subleased the Burbage property, plus the adjacent Larmar property, to Larmar Associates, which latter transfer was pursuant to a redeemable ground rent agreement. Subsequent to this sublease and lease, Larmar Associates erected the 35-unit Spinnaker Condominiums building on the Larmar property.

On his 1972 Federal income tax return, petitioner reported no income from the lease of the Burbage property to Larmar, although he reported total gross income of $267,340.05 and taxable income of $131,556.63.

## B. 1974 Exchange

On March 14, 1974, petitioner entered into a tripartite exchange agreement with Larmar and Larmar Associates. Under the exchange agreement, Larmar Associates agreed to create, prior to July 1, 1974, Maryland ground rents on each of the 35 units in the Spinnaker Condominiums (hereinafter unit ground rents). Promptly after the creation of these unit ground rents, Larmar Associates agreed to convey to Larmar 18 unit ground rents having an aggregate capitalized value of $180,000 and total annual payments due thereunder of $10,800. Larmar accepted these 18 unit ground rents in partial redemption of the Larmar property pursuant to its redeemable ground rent agreement with Larmar Associates. Immediately thereafter, Larmar conveyed to petitioner the 18-unit ground rents "in complete redemption and satisfaction of and in exchange for the Burbage Ground Rent." Petitioner, in turn, delivered to Larmar a deed in fee simple to the Burbage property which extinguished the original ground rent between petitioner and Larmar and petitioner's reversionary interest in the Burbage property.

Following this exchange, Larmar owned the Burbage property in fee simple, Larmar Associates apparently owned the Larmar property,[4] and petitioner owned 18 unit ground rents in the Spinnaker Condominiums. Petitioner had to look to each of the condominium owners separately for payment of the aggregate annual ground rents of $10,800. In the event one of the condominium owners defaulted on his rental payments to petitioner, petitioner could reenter the premises, subject however to any incumbrances placed on the property by the lessee. As of the date of the trial herein, petitioner had received all of the ground rent payments from the condominium owners, although he was sometimes forced to contact the condominium owners to collect the amounts due.

Because the condominiums had not been completed on the date that the tripartite exchange was executed, Larmar guaranteed the aggregate $10,800 payments due under the 18 unit ground rents until such time as each of the units was sold and the first purchaser became liable to petitioner for the annual ground rent. Pursuant to this guarantee agreement, Larmar paid petitioner $15,357 in 1974 and $5,400 in 1975.[5]

On his 1974 and 1975 Federal income tax returns, petitioner reported the $15,357 and $5,400, respectively, as the sale proceeds of capital assets held for more than 6 months.[6] He claimed a cost basis of $543 in 1974 and $191 in 1975, the derivation of which amounts was unexplained at trial or on brief. From these calculations, petitioner reported long-term capital gain of $14,814 in 1974 and $5,209 in 1975.

JAMAICA INDUSTRIES, INC.

During March 1969, Jamaica Industries, Inc. (hereinafter Jamaica), was organized under the laws of Maryland and it properly elected to be taxed as an electing small business corporation pursuant to the provisions of subchapter S[7] with a

[4]Larmar Associates' precise interest following the tripartite exchange is unclear from the record.
[5]The $20,757 aggregate sum received by petitioner during 1974 and 1975 is $843 less than the $21,600 petitioner would have received if Larmar had paid the full $10,800 per year. The record does not disclose why petitioner received less than $21,600 nor why he received more than $10,800 in 1974.
[6]During 1974 and 1975, the holding period for long-term capital gains was 6 months. Sec. 1222(3).
[7]The subch. S Revision Act of 1982, Pub. L. 97–354, 96 Stat. 1669, significantly altered the rules applicable to electing small business corporations for tax years beginning after 1982.

fiscal year ending October 31. Throughout the years in issue, petitioner was a 50-percent shareholder in Jamaica. The remaining 50 percent of Jamaica's shares were owned by Lee W. Bolte (hereinafter Bolte), an attorney practicing in Maryland. Throughout the years in issue, Jamaica's principal activity consisted of lending money and engaging in real estate transactions.

Petitioner and Bolte equally but informally divided the responsibilities of running Jamaica. Generally, petitioner was responsible for generating business deals, and Bolte was responsible for drafting the documents necessary to carry them out. When petitioner learned of a prospective business transaction, he would discuss it with Bolte and they would decide whether to proceed with the arrangement. When they agreed a transaction was acceptable, Bolte would draft the documents to reflect their understanding of the agreement.

At some undetermined time prior to 1974, James B. Caine (hereinafter Caine) was interested in acquiring a controlling stock interest in the Bishopville Bank, a local Maryland bank. Caine approached petitioner and asked if he would be willing to assist Caine in acquiring the stock. At that time, one of petitioner's relatives owned the largest single block of stock in the Bishopville Bank, and petitioner was the director of the Calvin B. Taylor Bank which also owned a significant block of Bishopville Bank stock. Petitioner agreed to help Caine obtain the stock, although there was no written agreement regarding compensation for petitioner's assistance. With petitioner's aid, Caine acquired the Bishopville Bank stock from both the Calvin B. Taylor Bank and petitioner's relative.

On March 6, 1974, Jamaica loaned Caine and his wife $50,000 secured by a second mortgage on several of Caine's Ocean City properties. In April 1974, Caine transferred to Jamaica a total of $52,500 in repayment of the loan.[8]

On April 29, 1974, Jamaica made an additional $50,000 loan to Montego Bay Development Corp., a corporation solely owned by Caine. A note reflecting this April 1974 $50,000 loan provided that repayment was to be made in 30 days "with interest of $5,000.00."[9] On May 14, 1974, Caine caused Mon-

---

[8]No promissory note memorializing this March 1974 loan was offered into evidence.

[9]Because of a variety of circumstances Caine, a real estate developer in the Ocean City, Md., area, did not borrow money from banks. Instead, he borrowed from individuals and small

tego Bay Development Corp. to repay a total of $55,000 to Jamaica. Montego Bay Development Corp.'s check stub showing repayment of the $55,000 bore the notation "In full for interest and principal of note dated 4/29/74, to be paid withiinterest [sic] on 5/29/74." No document related to either the March 6 or April 29 loans made any reference to compensation for petitioner's services in assisting Caine in obtaining the Bishopville Bank stock.

On its U.S. Small Business Corporation Income Tax Return (Form 1120S) for the fiscal year ending October 31, 1974, Jamaica reported taxable income of $8,075. Of this amount, $575 was reported as "Gross receipts or gross sales" and the remaining $7,500 was reported as "other interest." The $7,500 in "other interest" was the amount that Jamaica received in excess of principal from its loans to Caine and Montego Bay Development Corp. during its 1974 fiscal year. Jamaica also reported deductions totaling $93,158.78 which resulted in a reported net loss of $85,083.78 for its fiscal year ending October 31, 1974. Pursuant to section 1374 petitioner, as a 50-percent shareholder in a subchapter S corporation, reported one half of Jamaica's loss on his 1974 individual income tax return.

In the April 4, 1979, notice of deficiency, respondent disallowed petitioner's distributive share of Jamaica's losses for the fiscal years ending October 31, 1974, and October 31, 1975, in the amounts of $42,542 and $9,885, respectively, on the ground that Jamaica had received excessive passive income during its 1974 fiscal year which terminated its subchapter S election pursuant to section 1372(e)(5).

OPINION

GROUND RENT TRANSACTIONS

*Issues 1 and 2: Statute of Limitations and 1972 Maryland Ground Rent Lease Transaction*

We must determine whether assessment of the deficiency for petitioner's 1972 taxable year is barred by the statute of limitations.

---

corporations and paid extremely high rates of interest, frequently around 100 percent. The loans that he received from Jamaica reflected interest rates that Caine often paid to finance his various real estate deals.

Section 6501(a) provides the general rule that taxes must be assessed within 3 years after the return was filed. Since petitioner's 1972 return was deemed filed on April 15, 1973, and the notice of deficiency was mailed on April 13, 1979, assessment of the deficiency for petitioner's 1972 taxable year is barred by the 3-year statute of limitations. Sec. 6501(a).

Section 6501(e)(1), however, establishes an exception to the general rule. Where a taxpayer files a return that omits in excess of 25 percent of the gross income required to be shown thereon, the tax may be assessed at any time within 6 years after the return was filed. Respondent has conceded that the 3-year statute of limitations has expired and that assessment of the deficiency for petitioner's 1972 taxable year can only occur if the section 6501(e)(1) six-year statute of limitations is applicable in the instant case. Respondent bears the burden of proving that petitioner has omitted in excess of 25 percent of the gross income required to be shown on petitioner's returns. *Rhombar Co. v. Commissioner*, 47 T.C. 75, 85 (1966), affd. 386 F.2d 510 (2d Cir. 1967).

To determine whether petitioner omitted in excess of 25 percent of the gross income required to be shown on his 1972 return, we must decide whether petitioner's 1972 transfer of the Burbage property pursuant to a 99-year redeemable Maryland ground rent lease constituted a taxable sale or exchange.

Respondent argues that petitioner's lease of the Burbage property qualifies as a redeemable ground rent under section 1055 which treats the redeemable ground rent as though it were in the nature of a mortgage. Consequently, respondent maintains that the 1972 lease transaction constituted a taxable sale or exchange of the Burbage property to Larmar for $180,000, the capitalized value of the rental payment pursuant to Maryland law, which resulted in a long-term capital gain to petitioner of $144,180.

Petitioner, on the other hand, argues that the 1972 lease transaction was not a sale or exchange because the lease that petitioner received was not a redeemable ground rent within the meaning of section 1055(c). Under petitioner's analysis, the 1972 lease transaction is merely a long-term lease that generates ordinary income as payments are received thereunder.

Section 1055 generally provides that a redeemable ground rent is treated in the nature of a mortgage. The lessor of the real property subject to a redeemable ground rent is treated as though he had sold the property subject to a mortgage in a face amount equal to the redemption price[10] of the redeemable ground rent. The lessee, in turn, is allowed to deduct the rental payments as interest pursuant to section 163(c). The amounts paid to redeem the ground rent, however, are not deductible as interest.

In 1963, Congress enacted section 1055 and the complementary section 163(c) specifically to overrule the result reached in two Fourth Circuit cases that substantially altered the tax treatment theretofore accorded redeemable grounds rents. From 1921 until the late 1950's, Treasury Department rules and regulations allowed taxpayers who acquired property pursuant to redeemable ground rents to deduct the annual rental payments as interest. In addition, the lessor of the property included the redemption price of the ground rent in the amount realized in the same manner as the face amount of a purchase money mortgage. S. Rept. 72, 88th Cong., 1st Sess. (1963), 1963–1 C.B. 417. In *Estate of Simmers v. Commissioner*, 231 F.2d 909 (4th Cir. 1956), affg. 23 T.C. 869 (1955), and *Welsh Homes, Inc. v. Commissioner*, 279 F.2d 391 (4th Cir. 1960), affg. 32 T.C. 239 (1959), however, the Fourth Circuit held that the lessor of property pursuant to a redeemable ground rent did not have to report the capitalized value of the lease in income until the lease was in fact redeemed. The court reasoned that until such time as the lessee exercised his statutory option to redeem, the lessor remained the actual owner of the property. *Estate of Simmers v. Commissioner, supra* at 914. As a result, the lessor did not report the transaction as though a sale occurred until the land was redeemed and the lessee could not deduct the rental payments as interest.

Congress enacted sections 1055 and 163(c) specifically to overrule the results obtained in *Welsh Homes* and *Estate of Simmers*. As the Senate Finance Committee report recommending adoption of the proposed legislation stated:

---

[10]The redemption price of a Maryland redeemable ground rent is determined by State law to be the value of the annual ground rent capitalized at 6 percent. Md. Ann. Code art. 21, sec. 8–102(b) (1957).

Your committee believes, without regard to the formal legal theory involved, that the result obtained under the [*Welsh Homes* and *Estate of Simmers*] court decisions in practice is the wrong result. It sees no reason why the home buyers in Maryland should receive smaller deductions for tax purposes with respect to payments made on their homes than is true of taxpayers elsewhere with respect to similar payments made on their homes.

On the other hand, there also appears to be no justification in permitting the seller of the property in these cases to reduce the gain at the time of his sale below that which would be realized in other States merely by making use of the redeemable ground rent device available in Maryland, rather than a purchase money mortgage which generally would be used in most other States to achieve substantially the same results.

In view of these considerations, your committee's bill, as amended, restores the old rules and regulations of the Treasury Department. First, the code is amended to provide that annual or periodic rentals under a redeemable ground rent (except the amounts paid in redemption of this rent) are to be treated as interest paid on a mortgage indebtedness. Second, the special rules of the code dealing with gain or loss on the disposition of property are amended to treat a redeemable ground rent as a mortgage and to provide that real property held subject to liabilities under a ground rent is to be treated as being held subject to liabilities under a mortgage. [S. Rept. 72, *supra*, 1963–1 C.B. at 418.]

The Senate Finance Committee report also recommended adoption of a new section 1055(c) which defines a redeemable ground rent. This amendment was adopted when the full bill was enacted into law by Act of Apr. 10, 1963, Pub. L. 88–9, 77 Stat. 6. Section 1055(c) defines a redeemable ground rent as follows:

SEC. 1055(c). REDEEMABLE GROUND RENT DEFINED.—For purposes of this subtitle, the term "redeemable ground rent" means only a ground rent with respect to which—

(1) There is a lease of land which is assignable by the lessee without the consent of the lessor and which (together with periods for which the lease may be renewed at the option of the lessee) is for a term in excess of 15 years,

(2) the leaseholder has a present or future right to terminate, and to acquire the entire interest of the lessor in the land, by payment of a determined or determinable amount, which right exists by virtue of State or local law and not because of any private agreement or privately created condition, and

(3) the lessor's interest in the land is primarily a security interest to protect the rental payments to which the lessor is entitled under the lease.

The parties agree that the lease agreement between petitioner and Larmar satisfies paragraphs (1) and (2) of section

1055(c). Petitioner, however, contends that his interest in the Burbage property is not primarily a security interest to protect the rental payments within the meaning of section 1055(c)(3). Petitioner argues that the provisions of section 1055(c)(3) are ambiguous and that, because it is unclarified by the regulations, it must be interpreted in light of congressional intent. Petitioner asserts that the legislative history shows a congressional intent to provide interest deductions to home buyers who obtained property under ground rent leases rather than conventional mortgages, but that Congress never intended "to change the tax consequences of a long-term lease between an individual lessor and a corporate lessee, neither of whom understood that a sale or exchange had occurred." The essence of petitioner's argument is that Congress primarily intended sections 1055 and 163(c) to provide relief to *home buyers* by granting them mortgage-like interest deductions, but that section 1055 is not applicable to ground rents involving business property, because the lessee in a business context, like Larmar, can deduct the rental payments under section 162(a) and does not need the benefit of sections 1055 and 163(c).

Respondent asserts that petitioner's Maryland ground rent lease qualifies as a redeemable ground rent under section 1055(c), and that petitioner's interest in the Burbage property is primarily a security interest to protect the rental payments. For the reasons stated below, we agree with respondent.

On its face, section 1055(c)(3) appears to apply to petitioner. Under the terms of petitioner's lease agreement, the only rights that he retained on the Burbage property were (1) the right to collect annual rentals from Larmar and (2) the right to reenter the property in the event that Larmar defaulted on its obligation to pay rent. Petitioner's retention of the right to reenter the premises in the event Larmar defaulted on its rental obligations can only be characterized as a security interest. Generally, a security interest is an interest in property acquired by contract for the purpose of securing payment or performance of an obligation. Secs. 6323(h)(1), 7701(a)(28). Clearly, under this definition petitioner's interest in the Burbage property is a security interest because his right to reenter the property in the event Larmar defaults provides his only assurance that Larmar will continue to honor its

obligations to petitioner. Petitioner has offered no other reason for his retention of the right to reenter the premises in the event of default and we can think of none. Accordingly, petitioner has not met his burden of proving that he does not fall within the provisions of section 1055(c)(3). *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Moreover, even were we to accept petitioner's argument that section 1055(c)(3) is ambiguous, the legislative history makes it abundantly clear that Congress intended to bring all Maryland redeemable ground rent leases within the provisions of sections 1055 and 163(c). First, in describing the proposed definition of redeemable ground rent in section 1055(c), the Senate Finance Committee made the following statement which clearly illustrates that Congress believed Maryland ground rents merely provided the lessor with a security interest in the property to protect the rental payments:

In Maryland, in order to have a statutory right of redemption the term (including renewals) must be for at least 15 years and is frequently for 99 years. These arrangements are used primarily as vehicles in the financing of the purchase of real property. An essential characteristic is that in actuality the "tenant" has the equivalence of fee simple ownership in the land, *and the "landlord" has only a security interest in the property to protect the rental payments to which he is entitled.* The landlord does not have the usual liabilities of a landowner for taxes on the property, nor in tort. Upon ejectment of the "tenant" for nonpayment of the ground rent, the "tenant" has certain rights to redeem his property by curing his default within a limited period of time (similar to the remedy of a mortgagor with an equity of redemption). [S. Rept. 72, *supra*, 1963–1 C.B. at 419. Emphasis supplied.]

Second, the committee stated that it intended sections 1055 and 163(c) to "[restore] the old rules and regulations of the Treasury Department." S. Rept. 72, *supra*, 1963–1 C.B. at 418. A review of the Treasury's "old" rules shows it treated all redeemable Maryland ground rent leases as mortgages regardless of whether the property sold was business property or a personal residence. G.C.M. 2042, VI–2 C.B. 182 (1927). Therefore, petitioner's argument that Congress did not intend to treat Maryland ground rents involving business property under section 1055 is unsupported by the legislative history.

As a result, petitioner's lease of the Burbage property satisfies the requirements of section 1055(c), and pursuant to section 1055(a) and section 1.1055–2, Income Tax Regs., peti-

tioner is deemed to have sold the property on the date of the lease for a cash mortgage in a face amount of $180,000, the redemption price of the land.

Based on the record herein, the fair market value of this mortgage is $180,000. The redemption price of the ground rent lease is the best evidence of the fair market value of the Burbage property on the date of the lease transaction. If Larmar wanted to acquire the property in fee simple, it would have had to pay petitioner $180,000, regardless of how many rental payments it had previously made.[11] Therefore, the property securing Larmar's payments under the ground rent lease was worth 180,000, and in the event Larmar defaulted, it could be sold for that amount in full satisfaction of Larmar's obligation under the lease. Moreover, Larmar was unlikely to default on its payments because acquisition of the Burbage property by a third party could have destroyed the viability of its $1,250,000 project. Under these circumstances, it was highly probable that petitioner would receive all payments under the ground rent lease, and the mortgage had a fair market value equal to its face amount. Accordingly, respondent's deficiency determination with respect to petitioner's 1972 taxable year must be sustained.

Having determined that petitioner realized $144,180 long-term term capital gain from the 1972 lease of the Burbage property, we must determine whether this amount exceeds 25 percent of the gross income reported on his 1972 Federal income tax return. Contrary to petitioner's assertion, for purposes of this computation, 100 percent of petitioner's long-term capital gain must be included in determining the amount of gross income he reported in 1972. *Roschuni v. Commissioner*, 44 T.C. 80, 83 (1965). The following table shows petitioner's 1972 reported gross income:

| Item | Amount |
| --- | --- |
| Wages, salaries, and other employee compensation | $20,800.00 |
| Dividends | 2,496.37 |
| Interest income | 8,353.79 |
| Schedule C - Business Income | 13,000.00 |

[11]Under Maryland law in effect during the years in issue, Larmar could not have redeemed the lease prior to 3 years from the date of the lease. Md. Ann. Code art. 21, sec. 8–102(b) (1957).

| Item | Amount |
|---|---|
| Director's fee | $550.00 |
| Insurance policy gain | 1,138.50 |
| Rental income | 13,694.50 |
| Short-term capital gain | 5,022.86 |
| Long-term gain | 115,962.41 |
| Form 4797 gain | 273.15 |
| Small business corporation long-term gain | 86,048.47 |
| Total gross income | 267,340.05 |
| 25 percent of petitioner's total gross income | 66,835.01 |

Since petitioner reported gross income of $267,340.05 and failed to report gross income of $144,180, which amount is in excess of 25 percent of the reported gross income, assessment of the deficiency is not barred under the section 6501(e)(1)(A) six-year statute of limitations.

## Issue 3: Taxability of 1974 Exchange

We must next determine whether petitioner's transfer of his rights under the Burbage property ground rent lease in exchange for 18 condominium redeemable ground rent leases was a taxable event.

Section 1055(a)(1) and the regulations thereunder treat petitioner's ground rent lease on the Burbage property as a cash mortgage with a face value equal to the redemption price of the ground rent, here $180,000. Sec. 1.1055–2, Income Tax Regs. Similarly, the 18 condominium ground rent leases are treated as cash mortgages with a face value of $180,000, the stipulated aggregate redemption price of these 18 units. The 1974 exchange therefore involved the transfer of a $180,000 mortgage on land paying $10,800 per year for separate mortgages on 18 condominium units with an aggregate face value of $180,000 and annual payments due thereunder of $10,800. Based on the record herein, this exchange produced no taxable gain or loss to petitioner.

Generally gain or loss must be recognized on every sale or exchange of property. Sec. 1001(c). Gain is measured by the difference between the amount realized and the adjusted basis, and loss is measured by the difference between the adjusted

basis and the amount realized. Sec. 1001(a). The amount realized is the amount of money plus the fair market value of the other property received. Sec. 1001(b).

Respondent maintains the fair market value of the 18 condominium mortgages is $180,000 and that, because petitioner's basis in the mortgage on the Burbage property is $180,000, petitioner had no gain or loss on the exchange.[12] Petitioner presented the testimony and written report of an expert who asserted that the fair market value of the 18 condominium mortgages was between zero and $22,500.

Fair market value is defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both being reasonably informed of all relevant facts. *Epstein v. Commissioner*, 53 T.C. 459, 472 (1969). Petitioner bears the burden of proving that respondent's valuation is erroneous. *Brittingham v. Commissioner*, 66 T.C. 373, 410 (1976), affd. per curiam 598 F.2d 1375 (5th Cir. 1979).

We believe that the 18 ground rents that petitioner received in the 1974 exchange had a fair market value of $180,000. Section 1055 treats the 18 ground rents as cash mortgages with a face value of $180,000. Petitioner testified that he always received payment under these mortgages. Furthermore, petitioner's security for payment of the ground rent was substantial. In the event of default, he could reenter a condominium and sell it subject however to any second mortgage used to purchase the condominium. Moreover, we note that under Maryland law, petitioner's interest in the Burbage property could not have been redeemed until 3 years after the creation of the ground rent. Md. Ann. Code art. 21, sec. 8–102(b) (1957). It is inconceivable that 1 year prior to the time at which it could be redeemed for $180,000, he would exchange the property for a lesser sum. Finally, petitioner's expert presented contradictory opinions with respect to the value of the 18 condominium mortgages. At trial, the expert stated that the 18 condominium ground rents were worthless, while in his written report he stated that they were worth $22,500. This inconsistency was not explained, and in light of

---

[12]Respondent has not directly argued that the 1974 exchange had no tax consequences, although on brief and at trial he conceded that petitioner was only taxable in 1972 or 1974, but not in both years.

the fact that petitioner testified that he received all payments under the 18 ground rents, the zero valuation is obviously incorrect and it calls into question this expert's entire analysis. Under the circumstances, we conclude that the 18 condominium ground rents had a fair market value of $180,000. Consequently, petitioner sustained no gain or loss on the 1974 exchange.

## *Issue 4: Guarantee Payments from Larmar*

During 1974 and 1975, petitioner received $15,357 and $5,400, respectively, from Larmar pursuant to a guarantee clause in the exchange agreement. The amounts Larmar paid petitioner were due only to the extent that any of the 18 condominiums had not been sold to the first purchaser and insured that petitioner would receive a total of $10,800 per year from either the purchaser of the condominium or from Larmar. Under the circumstances, the payments constituted rental payments under the 18 ground rent leases from either Larmar or the condominium purchaser. See *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952). Since we have previously held that section 1055 treats the ground rents as in the nature of mortgages, petitioner must include the rental payments in income as interest on indebtedness secured by a mortgage. Sec. 163(c).

## JAMAICA INDUSTRIES, INC.

### *Issue 5: Termination of Jamaica's Subchapter S Status*

Finally, we must determine whether Jamaica received excessive passive investment income during its fiscal year ending October 31, 1974, which terminated its subchapter S election pursuant to section 1372(e)(5).

During its fiscal year ending October 31, 1974, Jamaica reported gross income of $8,075. Of this amount, Jamaica reported $7,500 as "other interest," and $575 as income from gross receipts or gross sales. Respondent maintains that the $7,500 was correctly reported as interest income from two $50,000 loans that Jamaica made to Caine or his solely owned corporation and, therefore, since more than 20 percent of Jamaica's 1974 fiscal year income was derived from interest,

Jamaica's subchapter S election was properly terminated pursuant to section 1372(e)(5).

Petitioner argues that Jamaica's return for its fiscal year ending October 31, 1974, incorrectly labeled the $7,500 as interest income. Petitioner asserts that the $7,500 received from Caine represented compensation for services that petitioner rendered to Caine when Caine was attempting to purchase a controlling interest in the Bishopville Bank. As service income, petitioner argues that the $7,500 does not fall within the section 1372(e)(5)(C) definition of passive investment income and Jamaica's subchapter S election was improperly terminated.

For the following reasons, we believe that Jamaica correctly reported the $7,500 as interest income on its 1974 fiscal year return. First, the loan document memorializing the April 29, 1974, loan specifically provided that repayment was to be made in 30 days "with interest of $5,000.00." Second, Bolte, petitioner's equal partner in Jamaica, testified that the $7,500 received from Caine in excess of principal represented interest on the two $50,000 loans. Caine similarly testified that the amounts he paid in excess of principal were interest. In view of the overwhelming evidence that Caine's payments to Jamaica were interest, petitioner's undocumented assertion that the payments constituted compensation for services is untenable. Moreover, although the interest rate paid was extremely high and might in other circumstances suggest that more than interest was being paid, Caine testified that he often paid annual interest rates of approximately 100 percent on short-term loans. We find, therefore, that respondent properly terminated Jamaica's subchapter S election for its fiscal year ending October 31, 1974.

To reflect the foregoing,

*Decision will be entered under Rule 155.*