T.C. Memo. 2003-94

UNITED STATES TAX COURT

ERNST L. MEIER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6048-00.                    Filed March 31, 2003.

Charles J. Hlavinka, for petitioner.

William F. Castor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined a deficiency in petitioner's Federal income tax for 1993 in the amount of $368,263.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issue for decision is whether for 1995 petitioner is entitled to a bad debt deduction in the amount of $3,207,578. This issue turns on whether, for purposes of section 166, certain fund transfers that petitioner made to Blackland Investment Co., Inc. (Blackland), a corporation that petitioner appears to have controlled, constituted loans and, if so, whether such loans became worthless in 1995. Resolution of this issue will affect net operating loss carrybacks that petitioner claims for 1992 and 1993.

Certain books and records and other information relating to petitioner, to ownership and operation of Blackland, and to the transactions at issue herein are not in evidence. As a result, aspects of our Findings of Fact are not as specific as they should be. Petitioner is largely responsible for the situation in which we find ourselves, as petitioner himself (and other key individuals) did not testify at trial.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

In 2000, at the time the petition was filed, petitioner, a German national, resided in Italy.

From 1988 through 1995, petitioner's primary residence was located in Germany, but petitioner also maintained a rental residence in Garland, Arkansas.

Between 1988 and 1993, petitioner and Garland Farms, Inc. (Garland Farms), another Arkansas corporation that petitioner established and that petitioner also appears to have controlled, acquired a number of farm properties located in Arkansas and Louisiana for the purpose of dividing the properties into smaller parcels and leasing the properties to farmers (tenant farmers), which in fact occurred.

Petitioner was the initial president of Garland Farms. The sole direct shareholder of Garland Farms apparently was Bitola Co. Establishment (Bitola), a Liechtenstein corporation, the stock ownership in which was not credibly established at trial.

In July of 1988, Alexander Frick nominally became the president of Garland Farms, but Frick simultaneously executed a power of attorney on behalf of Garland Farms authorizing petitioner to control and operate Garland Farms, under which power of attorney petitioner also had the power to control the funds of Garland Farms. Frick did not testify at the trial. During the years 1988 through 1996, various employees of Garland Farms regarded petitioner as the owner and/or general manager of Garland Farms.

Trial evidence suggests that the tenant farmers to whom Garland Farms leased the farm properties represented high credit risks and could not obtain financing from commercial banks to finance their farm operations.

On April 3, 1992, Blackland was incorporated in Arkansas for the purpose of making loans to the tenant farmers to whom Garland Farms leased farm properties.

During 1994, 1995, and 1996, petitioner was secretary of Blackland, and various employees of Garland Farms were the nominal shareholders and other officers of Blackland and were involved, along with petitioner, in the day-to-day operations of Blackland. Blackland, however, did not treat any of its officers, nor anyone else, as employees, and Blackland did not pay any wages. Blackland's balance sheets for December 31, 1992, through December 31, 1996, reflect that its nominal shareholders paid a total of $1,000 for their stock in Blackland.

The record does not reflect that petitioner owned any direct stock interest in Blackland. As indicated, however, petitioner appears to have been in control of Blackland, and petitioner provided Blackland with most of the funds Blackland needed to make loans to the tenant farmers.

In April of 1992, petitioner contends that he, as creditor, entered into a financing arrangement with Blackland that constituted a revolving line of credit with Blackland under which

petitioner alleges he agreed to loan to Blackland a maximum principal amount of up to $2 million at an annual interest rate of 7.5 percent.  Other than general reference in the note referred to below to a loan from petitioner to Blackland, petitioner's purported agreement to extend a multimillion dollar line of credit to Blackland is not documented in the trial evidence.  No written loan agreement or line of credit agreement was executed by petitioner.

On April 13, 1992, a document entitled "revolving credit note" was executed only by the nominal president of Blackland in favor of petitioner under which Blackland purported to agree to repay to petitioner funds to be extended to Blackland under the above purported revolving line of credit (revolving credit note). No schedule for the payment of principal or interest is set forth in the revolving credit note, other than simply to indicate that any outstanding principal would be payable on demand no later than December 31, 1992, and, as indicated, the note makes general reference to an obligation of petitioner to make a loan to Blackland.  Petitioner, however, is not a signatory on the revolving credit note.

Petitioner controlled and determined the stated terms of Blackland's $2 million revolving credit note.  As stated above, the note was executed in 1992 by the nominal president of Blackland at the direction of petitioner.  No negotiations or

arm's-length discussions on behalf of Blackland occurred in connection with the terms of the $2 million revolving credit note.

According to the May 31, 1992, balance sheet and year-to-date income statement of Blackland that is in the record, at the time the $2 million revolving credit note was executed on April 13, 1992, on behalf of Blackland, Blackland had no capital, no income, and no retained earnings. No security agreement was entered into between petitioner and Blackland to provide collateral in favor of petitioner for any funds petitioner transferred to Blackland under the revolving line of credit.

During 1992 and until July of 1993, in spite of the existence of the April 13, 1992, revolving credit note, no transfers of funds occurred between petitioner and Blackland.

Minutes of the meeting of the nominal shareholders of Blackland held on March 9, 1995, state that the $2 million revolving credit note was orally renewed for 1993 and 1994.

On March 10, 1995, another document also entitled "revolving credit note" was executed by the president of Blackland in favor of petitioner under which Blackland again purported to agree to repay to petitioner funds to be extended to Blackland under a loan from petitioner up to a maximum principal amount of $2.5 million at an annual interest rate of 8 percent. No schedule for the payment of principal or interest is set forth in this second

purported revolving credit note (revolving credit note), and the note reflects no maturity date. The note makes general reference to an obligation of petitioner to make a loan to Blackland. Petitioner, however, is not a signatory on this revolving credit note.

As was the first, this second revolving credit note was executed by the president of Blackland at the direction of petitioner. No negotiations or arm's-length discussions on behalf of Blackland occurred in connection with the terms of the March 10, 1995, $2.5 million revolving credit note. Again, no separate written loan agreement or line of credit agreement to be associated with this second revolving credit note is found in the record.

Beginning in July of 1993, and in 1994 and 1995, petitioner transferred funds to Blackland in the total cumulative amount of $3,545,020, and Blackland transferred funds to petitioner in the total cumulative amount of $724,480.

Blackland's monthly balance sheets as of July 31 and August 31, 1993, reflect the funds received from petitioner in those 2 months as "shareholder loans", even though petitioner claims not to have been a shareholder of Blackland. Beginning in September of 1993 and through 1996, the funds transferred by petitioner to Blackland were classified on Blackland's monthly balance sheets as "Note Payable-Moccasin Farms".

The nature of Moccasin Farms as a legal entity is not disclosed in the record. Petitioner contends, and respondent apparently does not dispute, that petitioner, Garland Farms, and Blackland treated Moccasin Farms as an alter ego of petitioner individually.

The schedule below reflects the dates and the amount of funds transferred between petitioner and Blackland in 1993, 1994, and 1995, as reflected on "worksheets" to which the parties have stipulated.

| Date | Amount Transferred By Petitioner To Blackland | Amount Transferred By Blackland To Petitioner |
|---|---|---|
| 1993 | | |
| 7/16 | $ 300,000 | |
| 8/11 | 80,000 | |
| 8/25 | 50,000 | |
| 9/10 | 730,350 | |
| 12/31 | | $ 40,471 |
| Total-1993 | $1,160,350 | $ 40,471 |
| | | |
| 1994 | | |
| 1/31 | $ 1,268 | |
| 5/11 | | $ 91,579 |
| 5/18 | | 25 |
| 5/27 | 474,054 | |
| 7/01 | 300,000 | 9,184 |
| 7/28 | 202,150 | |
| 7/31 | | 2,596 |
| 8/10 | | 1,399 |
| 8/17 | | 576 |
| 8/19 | | 2,247 |
| 8/24 | | 613 |
| 8/25 | 100,000 | |
| 9/13 | 300,000 | |
| 9/14 | | 342 |
| 9/19 | 100,000 | |
| 9/21 | | 1,000 |
| 10/05 | | 483 |
| 10/12 | | 1,601 |
| 11/02 | | 170 |
| 11/09 | | 245 |
| 11/15 | | 4,513 |
| 11/21 | 740 | 487,117 |
| 12/31 | | 19,065 |
| Total-1994 | $1,478,212 | $622,755 |

| Date | Amount Transferred By Petitioner To Blackland | Amount Transferred By Blackland To Petitioner |
|---|---|---|
| 1995 | | |
| 2/13 | | $      681 |
| 3/14 | | 1,253 |
| 4/20 | | 630 |
| 5/01 | | 2,599 |
| 5/11 | | 5,052 |
| 6/01 | | 135 |
| 6/07 | | 3,365 |
| 6/13 | | 360 |
| 6/21 | | 9,979 |
| 7/05 | | 7,250 |
| 7/10 | $  200,000 | |
| 7/12 | | 12,712 |
| 7/19 | 250,000 | |
| 7/26 | | 1,526 |
| 8/10 | | 78 |
| 8/21 | 250,000 | |
| 8/31 | | 4,130 |
| 9/18 | 30,000 | |
| 10/13 | 85,000 | |
| 10/31 | 50,000 | 285 |
| 11/14 | 35,000 | |
| 12/31 | 6,458 | 11,219 |
| Total-1995 | $  906,458 | $ 61,254 |
| Total Cumulative | $3,545,020 | $724,480 |

With respect to the $487,117 transferred by Blackland to petitioner on November 21, 1994, $159,028 thereof was identified on the above worksheets as "accrued interest" on funds transferred by petitioner to Blackland as of that date, which were the only funds transferred by Blackland to petitioner between 1993 and 1995 that were identified as interest.

On March 10, 1995, the president of Blackland and petitioner signed a "security agreement" wherein Blackland purportedly granted petitioner a security interest in all of the then-owned and after-acquired property and assets of Blackland for the stated purpose of securing the funds transferred by petitioner to

Blackland under the terms of the purported $2 and $2.5 million lines of credit. There is, however, no evidence in the record of the filing of a financing statement by petitioner to perfect his purported security interest in the property and assets of Blackland with respect to funds he transferred to Blackland.

Also on March 10, 1995, there was adopted on behalf of Blackland a resolution to allow petitioner and petitioner's wife (who was not an officer or employee of Blackland) access to "any or all funds" from Blackland's bank accounts. The resolution reflects no limit on the purpose or use for which petitioner and his wife were authorized to make withdrawals from Blackland's bank accounts.

Between 1992 and 1995, using the funds received from petitioner, Blackland loaned millions of dollars to the tenant farmers to whom Garland Farms had leased farm properties. The funds loaned to the tenant farmers were used by the farmers to pay farm operating expenses and living expenses. On some occasions, Blackland would directly pay third-party vendors for expenses of the tenant farmers, and Blackland would add to the balance of the farmers' outstanding loans the amounts it had paid to the third parties on behalf of the farmers.

Funds loaned by Blackland to the tenant farmers were secured in favor of Blackland through security interests on the farmers' crops and crop proceeds, and Blackland's security interests

therein were perfected.  Also, as further security and as a loan repayment mechanism, the farmers assigned to Blackland their rights to crop insurance payments and to U.S. Department of Agriculture price support and production adjustment payments (hereinafter "Government payments").

The Government payments received by Blackland on behalf of the tenant farmers, as a result of the above assignment, were the primary source of the funds that were transferred by Blackland to petitioner.

By September of 1995, the tenant farmers owed Blackland approximately $3,250,000.

In September of 1995, based apparently on projected net losses for the tenant farmers, petitioner ceased transferring funds to Blackland except to the extent necessary for Blackland to finance the current harvest of various farmers' crops.

In October of 1995, letters were mailed on behalf of Blackland notifying suppliers of certain tenant farmers that Blackland would not pay any more expenses of the tenant farmers and notifying wholesalers (to whom the farmers sold crops) of the liens Blackland possessed on the crop sales proceeds.

As of December 31, 1995, the above-referred-to worksheets reflecting fund transfers between petitioner and Blackland reflect a purported total loan balance due from Blackland to

petitioner in the amount of $2,979,568[1] and interest due to petitioner as of that date of approximately $227,990[2].

Between December of 1995 and February of 1996, settlement agreements were entered into between Blackland, Garland Farms, and a number of the tenant farmers regarding repayment of the loans that the tenant farmers owed to Blackland. Under the terms of the above settlement agreements, crop production costs of certain farmers were to be paid by Blackland, and in return the farmers promised to transfer any crop proceeds, crop insurance payments, and Government payments received first to Garland Farms in payment of rent on the farm properties and then to Blackland in repayment of the loans.

In February of 1996, a number of the tenant farmers who had past due loans owed to Blackland and who had not yet entered into settlement agreements with Garland Farms and Blackland filed for bankruptcy.

For the first time, on Blackland's March 31, 1996, balance sheet (and thereafter on its balance sheets for April and May 1996) there is reflected a "Note Receivable" from petitioner,

---

[1]    $3,545,020 less $565,452 ($724,480 transferred by Blackland to petitioner less $159,028 of purported interest) equals $2,979,568.

[2]    A "worksheet" of petitioner's that was stipulated to by the parties reflects unpaid accrued interest for 1993 through 1995 owed to petitioner by Blackland in the amount of $227,990, or $20 less than the $228,010 interest claimed by petitioner as part of the bad debt deduction in issue.

suggesting that during the month of March 1996, there was transferred from Blackland to petitioner $600,000. Any such transfer apparently would have occurred under the above March 10, 1995, resolution in favor of petitioner and petitioner's wife with regard to their control of the funds of Blackland.

In April of 1996, those tenant farmers who had filed for bankruptcy entered into settlement agreements with Blackland under which Blackland agreed to release the tenant farmers from all liability to Blackland on the farm loans in return for an assignment from the tenant farmers to Blackland of all rights to crop proceeds, crop insurance payments, and Government payments.

The trial record does not disclose the amount of funds that Blackland and/or petitioner recovered under the above assignments by the farmers of their crop proceeds, crop insurance payments, and Government payments. From April 1, 1996 through December 1, 1996, however, Blackland's monthly balance sheets reflect that Blackland received approximately $350,000 in loan repayments from the tenant farmers.

Beginning with Blackland's June 30, 1996, balance sheet, Blackland's balance sheets make no further reference to a $600,000 note receivable obligation due from petitioner to Blackland, and yet there is no indication that petitioner made such a payment to Blackland.

Blackland's monthly balance sheets from January 1, 1996, through the end of November of 1996, reflect that Blackland's stated loan balance owed to petitioner was reduced by $33,293 from $2,979,568 to $2,946,275. On Blackland's December 31, 1996, balance sheet, the stated loan balance owed to petitioner was indicated as zero.

The evidence in the record does not reflect that petitioner ever made a formal demand for repayment from Blackland of the funds he transferred to Blackland between 1993 and 1995, and petitioner never attempted to obtain a monetary judgment against Blackland based on the funds transferred.

The only accounting books and records of petitioner (as distinguished from Blackland) relating to the funds he transferred to Blackland during 1993 through 1995 that are in evidence in this case consist of the above-mentioned worksheets. No income statements, balance sheets, general ledgers, journals, or complete bank account statements of petitioner relating to the funds he transferred to Blackland are in the record.

With regard to Blackland's financial records, the evidentiary record in this case includes Blackland's unaudited monthly and annual income statements and monthly balance sheets for 1992 through 1996, and general ledger accounts for limited periods of time.

Blackland was dissolved on March 28, 1997.

Petitioner's individual Federal income tax returns for 1992 through 1995 were prepared based on the accrual method of accounting.

On April 16, 1996, petitioner filed his individual Federal income tax return for 1995 on which there was claimed an ordinary business bad debt deduction in the amount of $3,207,578, based on the claimed balance due from Blackland as of December 31, 1995, with respect to the purported loans petitioner had made to Blackland (computed as $2,979,568 in principal and $228,010 in accrued interest). The bad debt deduction claimed by petitioner for 1995 did not take into account the $600,000 that petitioner appears to have withdrawn from Blackland in March of 1996, just days before the filing of petitioner's 1995 individual Federal income tax return.

Due mostly to the above-claimed bad debt deduction, petitioner's individual Federal income tax return for 1995 reflected a $3,267,334 net operating loss.

On October 15, 1996, petitioner filed an amended individual Federal income tax return for 1992 on which petitioner reflected a carryback of the above-claimed 1995 net operating loss.[3] Petitioner's amended income tax return for 1992 reflected a

---

[3] Previously, in 1995, petitioner had filed an amended individual Federal income tax return for 1992 to carry back a net operating loss reflected on petitioner's 1994 individual Federal income tax return.

refund due to petitioner in the amount of $215,353, which respondent denied.

Also on October 15, 1996, petitioner filed an amended individual Federal income tax return for 1993 on which petitioner claimed a carryback of the balance of the 1995 claimed net operating loss not used for 1992.[4]  Petitioner's 1993 amended income tax return reflected a refund due petitioner in the amount of $368,263, which respondent paid.

None of Blackland's income tax returns are in evidence. Blackland did not claim bad debt deductions relating to the loans Blackland made to the tenant farmers until the filing of Blackland's 1996 Federal income tax return, on which a bad debt deduction in the total amount of $2,872,776 relating thereto was claimed.

On audit of petitioner's 1993 and 1995 individual Federal income tax returns, respondent disallowed petitioner's claimed bad debt deduction for 1995 in the total amount of $3,207,568 and the related net operating loss carryback and refund claimed for 1993.

---

[4]     Previously, in 1994, petitioner had filed an amended individual Federal income tax return for 1993 to claim a foreign currency transaction loss that petitioner had not claimed on his original 1994 tax return.

- 17 -

OPINION

Section 166(a) allows bad debt deductions for loans that become worthless within a taxable year.  Petitioner bears the burden of proving that the amounts in question constituted loans and that such loans became worthless in 1995, the year for which the deduction is claimed.[5]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Under section 1.166-1(c), Income Tax Regs., bad debt deductions are limited to bona fide loans that arise from genuine debtor-creditor relationships and that are based on valid and enforceable obligations to pay fixed or determinable sums of money.  A gift or a contribution to capital does not constitute a valid loan for purposes of section 166.  In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976); sec. 1.166-1(c), Income Tax Regs.

Necessary to the existence of a debtor-creditor relationship is a finding that the taxpayer-creditor had a reasonable expectation of repayment.  Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).

Generally, courts analyze whether the requisite intent existed to repay funds transferred by a taxpayer to another

---

[5]    Because the examination of petitioner's individual Federal income tax return for 1995 commenced before July 23, 1998, sec. 7491 (relating to a possible shift of the burden of proof) is inapplicable.

individual or entity by examining objective evidence of the taxpayer's intentions. See, e.g., In re Uneco, Inc., supra at 1207-1208. Subjective evidence of the taxpayer's intent will also be considered. Id. at 1209.

The following factors, among others, are often considered: (1) Whether a purported loan was evidenced by a written promissory note; (2) whether interest was charged; (3) whether a schedule for repayment and a stated maturity date were established; (4) whether security or collateral for the purported loan existed (and was perfected); (5) whether the purported debtor corporation was thinly or inadequately capitalized; (6) whether the proportion of the corporation's debt to equity would justify the purported loan; (7) whether repayment of the purported loan was predicated on the success of the purported debtor's business; (8) whether the purported debtor had the ability to obtain a similar loan from a bank; (9) whether the purported creditor participated in the management of the corporation; and (10) whether the purported loan was repaid by the stated maturity date. Id. at 1207-1208; Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953).

The failure of parties to produce evidence in their possession and control may give rise to a negative inference that, if produced, the evidence would be unfavorable to them.

McKay v. Commissioner, 89 T.C. 1063, 1069 (1987), affd. 886 F.2d 1237 (9th Cir. 1989); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner argues that he reasonably expected repayment of the full $3,545,020 he transferred to Blackland between 1993 and 1995, plus interest, that the funds were transferred by him to Blackland based on a valid debtor-creditor relationship and on an enforceable debt obligation of Blackland, that the loans to Blackland became worthless in 1995, and, therefore, that he should be entitled to the $3,207,578 claimed bad debt deduction for 1995.

Respondent argues that petitioner has neither proved that the funds petitioner transferred to Blackland between 1993 and 1995 represented valid loans nor that the purported loans became worthless by December 31, 1995.

At the outset, we emphasize that the funds Blackland transferred to the tenant farmers are not in dispute. Respondent has not challenged the loan characterization thereof. At issue are only the funds petitioner transferred to Blackland. With regard thereto, we agree with both of respondent's arguments. The credible evidence before us is inadequate to establish that the funds petitioner transferred to Blackland constituted valid

and enforceable debt obligations and that the purported loans became worthless by December 31, 1995.

No written loan agreement or written line of credit agreement was signed by petitioner. The two documents entitled "revolving credit notes" were not negotiated on behalf of Blackland. Rather, they were executed on behalf of Blackland at the direction of petitioner. They provided no repayment schedule, and one of the two notes provided no maturity date. Petitioner never made a formal demand for repayment of the funds he transferred to Blackland.

Not until 1995 did petitioner enter into a security agreement with Blackland with regard to the approximate $1.5 million transferred to Blackland prior thereto, and there is no evidence in the record that such security interest was ever perfected.

Blackland initially recorded funds received from petitioner as "shareholder loans", even though petitioner claims never to have been a shareholder of Blackland. As we have found, however, regardless of the employees of Garland Farms who were named as nominal shareholders of Blackland, petitioner controlled Blackland. The evidence does not establish that the funds petitioner transferred to Blackland constituted loans. Rather, the funds appear to constitute transfers by petitioner to Blackland of equity capital.

General ledgers and income tax returns of Blackland for the relevant years are not in evidence, which would reflect the ledger and tax return treatment by Blackland of the funds received from petitioner and the details of Blackland's March 1996 $600,000 transaction with petitioner.

Petitioner, who has the burden of proof, has failed to establish that a genuine debtor-creditor relationship existed between Blackland and himself with regard to the funds in question and that the purported loans constituted valid debt.

Further, and in the alternative, we conclude that the evidence does not establish that the purported loans to Blackland became worthless by the end of 1995, the year for which the bad debt deduction is claimed.

As late as December 31, 1995, petitioner continued to transfer funds to Blackland, and in 1996 Blackland continued to transfer funds to petitioner.

In December of 1995, Blackland had just begun settlement negotiations with the tenant farmers which negotiations were not completed until April of 1996.  Blackland itself did not claim a bad debt deduction with regard to the loans it made to the tenant farmers until its 1996 Federal income tax return was filed.  Had Blackland in 1996 recovered more funds from the farmers, those funds would have been available to transfer additional funds back

to petitioner and reduce the claimed loan balance owed to petitioner.

As previously mentioned, petitioner and Frick failed to testify at trial, leaving unanswered significant questions regarding their relationship to Blackland and Garland Farms and the nature of the transactions in question. Under <u>Wichita Terminal Elevator Co. v. Commissioner</u>, <u>supra</u>, we infer that petitioner's testimony, if in evidence, would not have supported the loan characterization of the funds in dispute nor the claimed 1995 worthlessness thereof. Petitioner is not entitled to the claimed $3,207,578 bad debt deduction for 1995 and the claimed net operating loss carrybacks relating thereto are not allowable.

All other issues in this case were either expressly conceded by petitioner or, due to abandonment at trial and on posttrial briefs, are deemed conceded by petitioner. See, e.g., <u>Burbage v. Commissioner</u>, 82 T.C. 546, 547 (1984), affd. 774 F.2d 644 (4th Cir. 1985); <u>Zimmerman v. Commissioner</u>, 67 T.C. 94, 105 (1976); <u>Hunt v. Commissioner</u>, 22 T.C. 228, 229 (1954).

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.