T.C. Memo. 1998-111


UNITED STATES TAX COURT


JOAN WALTERS, F.K.A. JOAN GHERMAN, AND HENRY GHERMAN, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23443-91.               Filed March 18, 1998.


Henry Gherman and Joan Walters, pro se.

<u>Reginald R. Corlew</u> and <u>W. Robert Abramitis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows:

Petitioners Joan Walters and Henry Gherman:

| | | Additions to Tax | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| TYE | Deficiency | 6653(a)(1) | 6653(a)(1)(a) | 6653(a)(1)(B) | 6653(a)(2) | 6661 |
| 1982 | $3,191 | $160 | – | $28,318 | [1] | – |
| 1984 | 769,999 | 38,500 | – | – | [1] | $192,500 |
| 1985 | 679,323 | 33,966 | – | – | [1] | 169,831 |
| 1986 | 792,359 | – | $39,618 | [1] | – | 198,090 |

[1] 50 percent of the interest due on the entire deficiency in income tax.

Petitioner Henry Gherman:

| | | Additions to Tax | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| TYE | Deficiency | 6651(a)(1) | 6653(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
| 1987 | $566,350 | – | – | $28,318 | [1] | $141,588 |
| 1988 | 461,477 | $115,369 | $24,828 | – | – | 115,369 |

[1] 50 percent of the interest due on the entire deficiency in income tax.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent concedes the deficiency and additions to tax for taxable year ended 1982. Accordingly, references to the years in issue hereinafter refer to years ended 1984 through 1988.

The issues for decision are:

(1) Whether petitioners for taxable years ended 1984 through 1986 and petitioner Henry Gherman for taxable years ended 1987 and 1988 omitted income in the amounts determined by respondent, or in some other amounts. We hold that they omitted income to the extent determined herein.

(2)  Whether petitioners for taxable years ended 1984 through 1986 and petitioner Henry Gherman for taxable years ended 1987 and 1988 are liable for additions to tax under section 6653(a)(1) or (a)(1)(A).  We hold that they are, but subject to the relief provisions of section 6013(e).

(3)  Whether petitioners for taxable years ended 1984 through 1986 and petitioner Henry Gherman for taxable years ended 1987 and 1988 are liable for additions to tax under section 6653(a)(1)(B) or (a)(2).  We hold that they are, but subject to the relief provisions of section 6013(e).

(4)  Whether petitioners for taxable years ended 1984 through 1986 and petitioner Henry Gherman for taxable years 1987 and 1988 are liable for additions to tax under section 6661.  We hold that they are, but subject to the relief provisions of section 6013(e).

(5)  Whether petitioner Henry Gherman is liable for an addition to tax under section 6651(a)(1) for taxable year ended 1988.  We hold that he is.

(6)  Whether petitioner Joan Walters is entitled to innocent spouse relief under section 6013(e) for taxable years ended 1984 through 1986.  We hold that she is.

                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and accompanying exhibits are incorporated

into our findings by this reference. When they filed their petition, petitioner Henry Gherman (Mr. Gherman) resided in Atlanta, Georgia, and petitioner Joan Walters (Ms. Walters) resided in Miami, Florida.

Background Information

Petitioners were married in December 1956 and were divorced in July 1989. When they married, Ms. Walters was 20 years old. Petitioners had two children, Shari Gherman Rance (Shari), born in 1958, and Craig Gherman (Craig), born in 1963. Petitioners lived together from the time they married until August 1988, when Mr. Gherman fled the country. See infra. Ms. Walters sought the divorce because she became ashamed of the "Gherman" name. Mr. Gherman and Ms. Walters have two grandsons, Chasyn and Ashtyn Rance, who are the children of Shari and her former husband Leslie Rance (Mr. Rance), and one granddaughter, Kara, who is the child of Craig.

Before marriage, Ms. Walters graduated from high school and attended college for 1 year. She worked for Equity Advertising and later for the Theater Guild in the subscription department and as a script reader. Ms. Walters did not maintain her own checking account before marriage but instead relied on her father to cash her paychecks for her and to give her additional spending money. After petitioners married, Ms. Walters worked for 4 months as a receptionist for a knitting mill; then she did not

work outside of the home for many years, other than as described infra. She involved herself in various community and volunteer activities and at one time served as a secretary for the Miami chapter of the Congress of Racial Equality. Mr. Gherman handled the family's financial matters throughout the time that petitioners were married.

Mr. Gherman began selling insurance during the late 1950's or early 1960's. He worked hard and built up his business. Nonetheless, during 1969 petitioners filed for bankruptcy (1969 bankruptcy). Subsequently, Ms. Walters received a discharge in the 1969 bankruptcy. Mr. Gherman, however, did not receive a discharge, because the bankruptcy court found that he had obtained credit by issuing certain false financial statements. Following the 1969 bankruptcy, Mr. Gherman did not keep secret the fact that he was not granted a discharge in the bankruptcy proceeding, and at meetings with clients or potential clients he often mentioned that he had not been granted a discharge in the 1969 bankruptcy.

After the 1969 bankruptcy, petitioners sold their personal residence and used some of the proceeds to purchase another home. Ms. Walters considered the new house to be inferior to their prior house.

Following the 1969 bankruptcy, Mr. Gherman never again held an asset in his own name. Mr. Gherman used Ms. Walters' name to

transact his business and financial matters. Ms. Walters knew that Mr. Gherman used her name for those purposes because he had not been granted a discharge in the 1969 bankruptcy.

Financial & Investment Planning, Inc.

During March 1970, Mr. Gherman organized Financial & Investment Planning, Inc. (FIP) to sell insurance and, to provide financial services, employee benefit consulting, deferred compensation plans, estate planning, tax planning, and trust work. By 1988, FIP provided a range of business and financial services to its clients, who primarily were successful physicians located in the Miami area. Other clients of FIP included attorneys, accountants, commercial businesses, hospitals, and a university. FIP performed many financial functions for its clients, including collecting bills, paying employees, in some cases paying the clients' personal and household expenses, filing tax returns, and handling insurance, investments, and financial planning.

Warren Gherman, Mr. Gherman's brother, served as FIP's first president and as a director. From its beginning, however, Mr. Gherman controlled FIP and made all the decisions relating to its operations. He became president of FIP during 1976 and served in that capacity and as a director during the years in issue.

Ms. Walters was the sole shareholder of FIP and, until May 6, 1988, she served as its secretary and treasurer and as a

director.  Ms. Walters knew that the FIP stock was held in her name, because Mr. Gherman had not been granted a discharge in the 1969 bankruptcy.  Ms. Walters attended FIP's monthly board of directors meetings, signed FIP's corporate minutes, and, until 1984, was on FIP's payroll.  Ms. Walters, however, was not involved in the day-to-day operations of FIP, and she seldom visited FIP's offices during the years in issue.  Although Ms. Walters owned all of FIP's stock, FIP's clients knew that Mr. Gherman controlled FIP and that he made all decisions regarding its operations.  Those clients trusted Mr. Gherman and remained with him over a number of years.

Shari, a licensed insurance agent, was on FIP's payroll. From at least February 1983 until May 1988, Shari also served as a director of FIP.  In addition, she owned 50 percent of the shares of First Financial Planning Corp. of South Florida, Inc. (FFP), an S corporation formed during 1983 and controlled by Mr. Gherman.  FFP sold insurance to FIP's clients.  The record does not show the full extent of services that Shari performed for FIP or FFP or for any other corporation controlled by Mr. Gherman, but it does indicate that she was credited with selling insurance to FIP's clients.  Shari did not testify at the trial.

Craig also was on FIP's payroll.  He worked primarily as a mechanic for FIP.  In addition, from at least October 1984 until May 1988, Craig served as a director of FIP.  Craig owned 50

percent of the shares of FFP. The record does not show the full extent of services that Craig performed for FIP or for any other corporation controlled by Mr. Gherman. Craig did not testify at the trial.

Mr. Rance, Shari's husband, was on FIP's payroll as well. He managed FIP's real estate holdings, buildings, and office buildings. He additionally managed Custom-Molded, an orthopedic equipment company, for FIP.

Other than 1982, FIP operated at a loss. On its Forms 1120, U.S. Corporation Income Tax Return, for tax periods ended March 31, 1984 through 1989, FIP reported gross receipts, total income, and income or loss before net operating loss (NOL) as follows:

| FYE | Gross receipts | Total income | Taxable income (loss) before NOL |
|---|---|---|---|
| 3/31/84 | $1,395,875 | $1,482,346 | ($77,338) |
| 3/31/85 | 1,433,183 | 1,608,507 | (251,665) |
| 3/31/86 | 1,609,935 | 1,879,881 | (233,033) |
| 3/31/87 | 1,337,567 | 1,687,830 | (812,602) |
| 3/31/88 | 1,400,911 | 1,691,473 | (473,238) |
| 3/31/89 | 481,629 | 712,444 | (143,554) |

The returns for tax periods ended March 31, 1988 and 1989, were prepared by or for the trustee in bankruptcy for the 1988 bankruptcy. See infra.

During the years 1980 through 1985, FIP filed five petitions with the Court relating to taxable periods ended 1973 through 1981. In the notices of deficiency for those periods, respondent determined deficiencies in tax, in the aggregate, totaling

$1,078,177. Additions to tax for fraud were determined in the related notices of deficiency and affirmatively pleaded in the answers to the petitions for taxable periods ended 1973 through 1979. By agreement of the parties, decisions were entered wherein deficiencies in tax for taxable periods ended 1975 through 1981, aggregating $164,626, were sustained, but additions to tax for fraud were not sustained for any taxable period at issue.

In the notices of deficiency sent to FIP for years ended 1975 through 1981, respondent disallowed as unreasonable compensation deductions claimed for moneys FIP paid to Ms. Walters on the basis that Ms. Walters "performed no more than nominal services" for FIP. In those notices of deficiency respondent also disallowed as unreasonable a portion of the compensation FIP paid to Mr. Gherman. During 1984, Ms. Walters asked Mr. Gherman to remove her from FIP's payroll, because she wanted to avoid future problems with the IRS.

Another issue in those Tax Court cases related to activities in marketing tax shelters (film and art) to FIP's clients. Ms. Walters participated to some degree in setting up or putting together at least one tax shelter, but the record does not show the extent of that participation. Respondent also disallowed some business expenses claimed by FIP in the notices of deficiency for years ended 1973 through 1981. Unreported income

from an illegal activity, however, was not in issue for years ended 1973 through 1981.

Following the audit of FIP's tax returns for years ended 1973 through 1981, petitioners' accountants became more conscious of items, especially items of expense, recorded in FIP's books and records. From time to time, the accountants requested documentation for items recorded in the books and records to ascertain whether large or extraordinary items were reasonable and accurately recorded. The accountants' primary concern was to prevent personal expenditures' being claimed as business expenses on FIP's tax returns and to assure that withdrawals from FIP were properly recorded on FIP's books and records.

On April 9, 1985, FIP's board of directors authorized the corporation to establish a payroll deduction plan, optional at the employee's request, whereby certain enumerated payroll deductions would be allowed, e.g., for automobile insurance premiums, life, accident, and death and dismemberment insurance, mortgage payments, corporate and pension plan loan payments, court orders for family support, and automobile loan payments. During the years in issue, FIP had in effect a medical expense reimbursement plan whereby FIP reimbursed covered employees for their medical expenses. During those years, FIP also had a matching gift program whereby FIP agreed to match dollar for

dollar contributions made by FIP's professional employees to qualified U.S. charitable organizations.

FIP paid the personal expenses of Mr. Gherman, Ms. Walters, and other Gherman family members. FIP paid for the cars driven by petitioners and their children during the years in issue. The cars included Cadillacs, a BMW, a Town Car (Ms. Walters), and a Buick (Mr. Gherman).

FIP's books and records reflect that, dating back to 1975, FIP made personal loans to FIP's clients, employees, and shareholders, including Gherman family members or entities in which they held interests. The records also reflect payments of interest and principal on those loans. Ms. Walters was not aware that FIP's books recorded loans' being made to her.

During the years in issue, FIP chartered a 45-foot boat, the Camelot, from ShariCraig, Inc. (ShariCraig), an S corporation owned by Ms. Walters until 1986 when she sold her shares to Shari and Craig. Neither Shari nor Craig was actively involved in the day-to-day activities of ShariCraig. ShariCraig's books and records were maintained by Mike Landa (Mr. Landa), who also captained the boat. The record does not reveal in which year the Camelot was purchased by ShariCraig or the source of the funds for that purchase. The Camelot cost $150,000. FIP paid ShariCraig $600 for each day it used the Camelot, with a guaranteed charter of at least two times a month. It was docked

behind Mr. Landa's house or petitioners' house.  Petitioners used the Camelot for personal pleasure and to entertain FIP's clients.  The Camelot was rarely used by anyone other than petitioners or FIP.  On occasion, petitioners took the Camelot on weekend excursions and to vacation in the Bahamas.  On visits to the Bahamas, the boat would stay in Freeport for an extended period of time with Ms. Walters and Mr. and Mrs. Landa on board, while Mr. Gherman and clients of FIP would fly in from Miami to stay during the weekends.  When the Camelot was used to entertain FIP's clients, Ms. Walters helped prepare and serve food.

FIP had a bank account in its name at Commerce Bank, N.A. (the FIP account).  From 1983 through the end of 1986, hundreds of thousands, and sometimes millions, of dollars flowed through the FIP account each month.  All of the checks drawn on the FIP account required two signatures.  Mr. Gherman generally signed all of the checks written on the FIP account.  Additionally, during all of 1983 and until December 1984, Ms. Walters cosigned all of the checks.  During December 1984, Craig began also to cosign checks written on the FIP account.  From that point forward, Ms. Walters and Craig each cosigned approximately 50 percent of the checks.  Ms. Walters and Craig signed the checks in blank, usually 300 at a time, at their personal residences.  The blank checks then were taken to FIP's offices, usually by an FIP employee, for use when needed, at which time the checks would

be completed by Mr. Gherman or an FIP employee and then signed by Mr. Gherman. Between January 1983 and December 1986, Ms. Walters signed over 11,000 checks, of which she had written only two.

During the years in issue, Ms. Walters also had signatory authority over two bank accounts that were in her name. Ms. Walters shared with Mr. Gherman signatory authority on an account titled "Joan Gherman No. 2 account". Ms. Walters signed checks written on the Joan Gherman No. 2 account using the same process that was used for checks written on the FIP account except that only one signature was required on the Joan Gherman No. 2 account. During the years of its existence, hundreds of thousands of dollars flowed through the Joan Gherman No. 2 account. Any money earned by Ms. Walters was deposited into the Joan Gherman No. 2 account. Checks made payable to Mr. Gherman drawn on the FIP account were deposited into the Joan Gherman No. 2 account. Ms. Walters regarded the Joan Gherman No. 2 account as a business account. Business expenditures of FIP as well as some personal expenditures of petitioners were paid from the Joan Gherman No. 2 account. The bank statements for the Joan Gherman No. 2 account were mailed to FIP's business address, and the statements were reconciled by Mr. Gherman or an FIP employee.

The other account in Ms. Walters' name served as her personal checking account (Joan Gherman No. 1 account). Ms. Walters used the Joan Gherman No. 1 account for paying basic

household expenses, such as groceries, the cleaners, and the gardeners. Mr. Gherman made weekly deposits into the Joan Gherman No. 1 account. Ms. Walters recorded $500 in the check registrar as the weekly deposit amount regardless of the amount that Mr. Gherman actually deposited into the account. For the years in issue, Ms. Walters wrote and signed all but one of the checks issued from the Joan Gherman No. 1 account. Mr. Gherman or an FIP employee, however, generally balanced the bank statements for the Joan Gherman No. 1 account, and the bank statements were mailed directly to FIP's business address. Most of Ms. Walters' personal expenditures were paid for by major credit cards. Mr. Gherman paid the credit card bills from a checking account other than the Joan Gherman No. 1 account.

All of the money in the Joan Gherman No. 1 account and the Joan Gherman No. 2 account came directly or indirectly from FIP.

Ms. Walters had little interest in or awareness of the financial dealings that Mr. Gherman carried out in her name. She had absolute faith in Mr. Gherman's business judgment and followed his instructions without question. She would and did sign any document that he asked her to sign.

The Embezzlement

During August 1988, Mr. Gherman, suddenly and without any warning, abandoned his family and fled the United States to Taiwan. Until he was arrested, Ms. Walters did not know his

whereabouts. He took with him suitcases filled with $100 bills that totaled $4.4 million (exit money). Over a 10-day period before he fled the country, Mr. Gherman had written checks on the FIP account that totaled $5,092,500, of which $5,090,000 was made payable to Mr. Gherman and $2,500 was made payable to Ms. Walters. Some of the money in the FIP account came from funds that Mr. Gherman had embezzled from accounts of FIP's clients (primarily employee benefit trust accounts) through a so-called certificate of deposit scheme. See infra. Mr. Gherman was captured in Taiwan in October 1988 and subsequently returned to the United States for trial.

Mr. Gherman had deposited all of the funds he embezzled into the FIP account. He converted those funds to his own use. Mr. Gherman alone controlled the embezzled funds. Until he fled the country, Mr. Gherman's family, including Ms. Walters, did not know that Mr. Gherman was embezzling money from FIP's clients.

In an Information filed in the criminal case in the U.S. District Court, Southern District of Florida, Mr. Gherman was charged with having embezzled and converted for his own use, from or about December 1982 until or about August 1988, $9.8 million in assets from employee benefit plans entrusted to him. The Information alleged that, as part of the scheme to defraud, Mr. Gherman represented that funds were placed in certificates of deposit (CD's), but the investments were never made and the CD's

did not exist (the CD scheme).  The Information alleged further that, as part of the CD scheme, Mr. Gherman transferred embezzled funds to an account in a bank in Antigua, West Indies, that he had opened under the name of "Chaska Trading, Ltd." (Chaska Trading), and that approximately $2.2 million of those funds then were transferred to an account in Chaska Trading's name at Prudential-Bache Securities, Inc. (Prudential-Bache), and were available to Mr. Gherman.

Mr. Gherman entered into a plea agreement in which he admitted embezzling $9.7 million from FIP's clients, including the removal of $4.4 million in July and August 1988.  At his sentencing hearing, he claimed that the money did not go into his own pocket, but instead it went into the corporate funds of FIP, which he controlled, and that the money was used in the operations of FIP.  Of the $4.4 million exit money, $1 million was unaccounted for at the time of sentencing and was still unaccounted for at the time of the trial of the instant case.

In accordance with the plea agreement, Mr. Gherman was found guilty on three counts of mail fraud in violation of 18 U.S.C. sec. 1341, and four counts of embezzlement from employee pension funds in violation of 18 U.S.C. sec. 664.  On May 10, 1989, he was sentenced to consecutive sentences totaling 30 years.  He also was ordered to make restitution in the amount of

$12,903,250, less any recoveries made by the bankruptcy trustee. See infra.

The Federal Bureau of Investigation agent who investigated the embezzlement believed that approximately $3 million of the funds Mr. Gherman embezzled was used to support FIP's losses over the years 1982 through 1988, approximately $3 million was used in so-called loans to Mr. Gherman or family members, and the balance became the exit money.

The 1988 Bankruptcy

On August 10, 1988, certain clients of FIP filed a receivership action captioned Shapiro v. Gherman, against Mr. Gherman, FIP, and FFP in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, wherein the clients sought the appointment of a receiver, damages, and other relief. James Feltman (Mr. Feltman) was appointed receiver. A temporary restraining order was entered on that date which prohibited the defendants from transferring or otherwise disposing of their assets. Two days later, Mr. Feltman was authorized to seize the Camelot.

Subsequently, on August 18, 1988, while the receivership action was pending, some of the same clients commenced an involuntary chapter 11 bankruptcy proceeding against the same entities (bankruptcy estates) in the U.S. Bankruptcy Court for

the Southern District of Florida (bankruptcy court).  Mr. Feltman was appointed trustee of the bankruptcy estates.

Additionally, on August 31, 1988, creditors of Mr. Gherman filed an action in the High Court of Antigua, seeking the turnover of $2.97 million they alleged Mr. Gherman had deposited at that bank.  Subsequently, the three actions were consolidated in the bankruptcy court.  Hereinafter, we will refer to the consolidated proceedings as the 1988 bankruptcy.

On January 26, 1989, Mr. Feltman filed a cross-claim and third party complaint in the 1988 bankruptcy against Mr. Gherman, Ms. Walters, Shari, Craig, Mr. Rance, Chasyn Rance, Ashtyn Rance, and Kara Gherman (Gherman family members), wherein Mr. Feltman sought recovery of fraudulently transferred funds and assets purchased with those funds, and a denial of Mr. Gherman's discharge.  Mr. Feltman's position was that all assets owned by the Gherman family members were derived from embezzled funds and should be returned.

For purposes of the 1988 bankruptcy, accountants hired by Mr. Feltman prepared a schedule, dated November 22, 1988, entitled "Schedule of Perceived Certificates of Deposit by Investor" (CD schedule).  The CD schedule reflects the names of the individuals, corporations, estates, trusts, or other entities from whom Mr. Gherman had embezzled money as a part of the CD scheme.  The CD schedule also reflects, by date and segregated by

name of individual or entity, the amounts that had been either invested in a "phantom CD" or withdrawn from a "phantom CD" and redeposited into the party's account, with dates commencing December 15, 1982, and ending November 3, 1988. By year, the CD schedule indicates that Mr. Gherman had embezzled the following net amounts (withdrawals from accounts of FIP's clients less redeposits to accounts of FIP's clients) from FIP's clients as part of the CD scheme:

| Year | Withdrawals from accounts of FIP's clients | Redeposits to accounts of FIP's clients | Net amount |
|------|-----------|-----------|-----------|
| 1982 | $1,480,000.00 | -0- | $1,480,000.00 |
| 1983 | 1,315,000.00 | $685,000.00 | 630,000.00 |
| 1984 | 2,663,500.00 | 1,088,500.00 | 1,575,000.00 |
| 1985 | 1,726,162.52 | 565,000.00 | 1,161,162.52 |
| 1986 | 2,305,000.00 | 552,462.52 | 1,752,537.48 |
| 1987 | 3,794,500.00 | 2,086,000.00 | 1,708,500.00 |
| 1988 | 1,571,000.00 | 45,700.00 | 1,525,300.00 |
| Total | 14,855,162.52 | 5,022,662.52 | 9,832,500.00 |

Of the $1,525,300 net amount reflected on the CD schedule for calendar year 1988, a total of $155,300 of the withdrawals and redeposits were made on dates after Mr. Gherman fled the United States.

The CD schedule was introduced in evidence during the 1988 bankruptcy proceeding. Respondent used the CD schedule to develop the amounts reflected in the notices of deficiency as having been embezzled from FIP's clients on a year-by-year basis. See infra. The CD schedule was prepared from FIP's books and records and from subpoenaed bank records.

The accountants retained by Mr. Feltman also prepared a schedule entitled "Analysis of CD 'Sweep' Withdrawals" (Sweep schedule).  The Sweep schedule attempted to identify when money came into FIP for purported CD purchases, and to whom or where the money subsequently flowed.  A portion of the Sweep schedule later was incorporated into the CD schedule.  The Sweep schedule, among other things, shows disbursements to or for the benefit of Mr. Gherman, Ms. Walters, Shari, and Craig, as well as other individuals, and to various investment accounts.  Additionally, the Sweep schedule indicates "interest paid to CD participants" for the following years and in the following amounts:

| Year | Amount |
| --- | --- |
| 1983 | $83,815.92 |
| 1984 | 304,863.72 |
| 1985 | 282,452.50 |
| 1986 | 406,916.76 |
| 1987 | 484,547.94 |

The accountants retained by Mr. Feltman also prepared a schedule entitled "Disbursements From FIP, Inc. For Family Members" (family disbursements schedule) which attempted to itemize all moneys paid out of the FIP account to or for the benefit of Mr. Gherman or members of his family.  The family disbursements schedule reflects total disbursements to or for Mr. Gherman or his family members of $8,146,895.40, commencing December 1, 1982, and ending July 8, 1988.  The family disbursements schedule attempts to identify all transfers or

payments to or for Mr. Gherman or a family member by date, check number, payee, amount, and description. The accountant who prepared the family disbursements schedule made no attempt to distinguish legitimate disbursements (such as for business purposes or salaries) from nonlegitimate disbursements. The family disbursements schedule was prepared by use of FIP's books and records and for use in the 1988 bankruptcy proceeding.

Prior to trial in the 1988 bankruptcy, Mr. Feltman proposed a settlement with Ms. Walters, Shari, and Craig whereby each of them would retain a residence, an automobile, furniture, personal possessions, and some cash. On the advice of Mr. Gherman, however, the Gherman family members rejected that offer. Following trial, the bankruptcy court issued a memorandum decision in favor of Mr. Feltman, as trustee, pursuant to which he was awarded approximately $6.2 million in money damages and a constructive trust over the homes, automobiles, boats, and other assets of Mr. Gherman and his family members. In addition, Mr. Gherman was denied a discharge. Accordingly, judgments were entered against Ms. Walters in the amount of $6 million and against other Gherman family members in various amounts. Pursuant to a subsequent settlement offer, however, the Gherman family members were released from the judgments entered against them and were paid $35,000. As a result of the 1988 bankruptcy, however, Ms. Walters, Shari, and Craig lost their personal

residences and other personal assets.  The $35,000 was retained by the Gherman family members' bankruptcy attorney.

The bankruptcy court further found that Justice for All, Inc. (see infra), Chaska Trading, Ltd., FFP, and ShariCraig, Inc., were sham corporations and mere instrumentalities and alter egos of FIP.

Mr. Feltman believed that no Gherman family member other than Mr. Gherman had any knowledge of Mr. Gherman's embezzlement activities before he fled the country.

Ms. Walters' Entertainment Business Activities

Sometime after Shari's birth, Ms. Walters started a personal management company to manage singing acts.  She formed Gherman Associates, Inc. (Gherman Associates), with Mr. Gherman's brother, Warren, to operate the personal management business. Gherman Associates operated as a subsidiary of FIP.  FIP owned 80 percent of the stock of Gherman Associates, Ms. Walters owned 5 percent of the stock, and Peter Michael Lewis, a Miami record producer and arranger, owned the remaining 15 percent.  Mr. Gherman, however, handled all of the financial aspects of Gherman Associates.

During 1969, Ms. Walters began managing Gherman Associates' first client, Barry Smith (Mr. Smith), who sang with the Gospel Jazz Singers.  She also managed the Gospel Jazz Singers.  Later, Mr. Smith introduced Ms. Walters to other singers whom she began

to manage; that is, the Freeman Sisters (who appeared as the opening act for well-known singers including Pat Boone, Engelbert Humperdinck, and Tom Jones) and Patti Jo (who appeared in the Broadway musical "Purlie").  Ms. Walters' activities on behalf of clients of Gherman Associates included writing biographies, handling press releases, counseling the clients regarding their craft, selecting clothing for them, working with choreographers and the artists as to their performances, selecting engagements, selecting promotional materials, making travel arrangements for them, and handling clients' personal matters.  Ms. Walters received a commission of 25 percent of the moneys earned by the acts, but she never made a profit from her activities.

Mr. Gherman used funds from FIP to help finance Gherman Associates' activities.  During March 1974, Gherman Associates' board of directors voted to write off as uncollectible moneys advanced to Mr. Smith, Patti Jo, and the Freeman Sisters.

Additionally, during the early 1970's, Ms. Walters produced a national traveling production of the musical "Purlie", with Patti Jo playing the female lead.  Mr. Gherman used FIP funds to help finance the production.  Ms. Walters additionally arranged for clients of FIP to invest in "Purlie".  Although well received artistically, "Purlie" ultimately lost money when it flopped in Los Angeles, California.

Also during the 1970's, Ms. Walters produced and cast a local production of "Bubbling Brown Sugar" at the Coconut Grove Playhouse in Miami, Florida.  Mr. Gherman provided money from FIP to fund that production.  Although an artistic success, "Bubbling Brown Sugar" lost money.  Mr. Gherman decided to close the production following a lawsuit he filed against the owner of the Coconut Grove Playhouse in which Mr. Gherman alleged that he was not getting a fair share of the proceeds from the show.

Over a year after Mr. Gherman was incarcerated, Ms. Walters received an offer to manage a nightclub and restaurant located in California.  She managed the business for 3 months until, through no fault of her own, the business failed.  Ms. Walters no longer engages in entertainment business endeavors, because she no longer has access to the money needed to finance them.  At the time of the trial of the instant case, Ms. Walters worked part-time as an embarkation representative for Carnival Cruise Line and earned $7.15 per hour.

Petitioners' Style of Living

When petitioners first moved to the Miami, Florida, area during 1957, they lived in an apartment.  Over the years that they were married, petitioners purchased and sold a number of personal residences.  Their first house cost about $16,500.  Except for the house they purchased immediately following the 1969 bankruptcy, each new residence was better than the prior

residence.  Following the 1969 bankruptcy, the residences were titled in Ms. Walters' name alone.

During 1981 or 1982, petitioners purchased waterfront property in Eastern Shores, an upscale section of North Miami Beach, Florida.  The property cost over $500,000 and consisted of two lots.  The house on the property had two stories, over 5,000 square feet, and five bedrooms.  Petitioners built a tennis court on the property.  As she had done previously with other homes, Ms. Walters employed domestic help whose wages were paid by Mr. Gherman from an account other than the Joan Gherman No. 1 account.

Petitioners sold their former home to Shari and her husband for $210,000.  Approximately $90,000 to $100,000 of the purchase price was paid by a note given to Ms. Walters.  The funds Shari used to purchase that house came from one or more of the accounts in her name that Mr. Gherman controlled.  None of the money in the account came from Mr. Rance, and he did not know from where it came.

Ms. Walters recognized that petitioners maintained a "nice" lifestyle and that it was similar to that of many of the people with whom they socialized.  She believed that the improvements in their standard of living were gradual over a number of years, commensurate with the increase in Mr. Gherman's income, and that there was no drastic change in their standard of living, inasmuch

as they always had a beautiful home and a good car, they always ate well, and they always went to good restaurants. She believed that the only extravagance in their lives was the purchase of the Camelot. Ms. Walters believed that the income reported on their income tax returns was sufficient to support their standard of living.

Mr. Gherman was considered extravagant in his use of money. Petitioners entertained FIP's clients and friends at their home at least five times each year. On occasion, petitioners gave shopping sprees for relatives at grocery stores and at least one department store (Macy's). The department store shopping spree was a Mother's Day gift for Shari and a few other relatives, but Ms. Walters was not one of the shoppers.

Dating back to 1965, petitioners had a history of making gifts. Petitioners together made gifts to Shari, Craig, Chasyn, and Ashtyn. During 1983 through 1987, petitioners made gifts of $20,000 each to Shari, Craig, and Chasyn. During 1986 and 1987, they also made gifts of $20,000 to Ashtyn. Petitioners signed joint gift tax returns for various years on which they reported that gifts had been made to their children and grandsons. The Internal Revenue Service (IRS) has no record of any gift tax returns filed by petitioners for any year. Nonetheless, the record shows that the IRS had received gift tax returns from

petitioners at least for calendar quarters ended March 31, 1975 and 1977, and for calendar year 1983.

An investment account in the name of Ms. Walters was maintained at Prudential-Bache. The funds in that account came directly or indirectly from FIP. Ms. Walters executed a power of attorney by which she authorized Mr. Gherman to manage her Prudential-Bache account. She knew that Mr. Gherman used the Prudential-Bache account to make investments on her behalf. Mr. Gherman made all decisions relating to the investment account.

Mr. Gherman funded and controlled brokerage accounts and banks accounts in the names of other members of his family. The funds in those accounts came directly or indirectly from FIP.

At the time of trial in the instant case, Ms. Walters lived in a townhouse condominium owned by Shari. Shari paid the mortgage on the condominium and Ms. Walters paid Shari what rent she could, but some months she paid nothing.

Prior Income Tax Returns

During the late 1970's or early 1980's, Mr. Gherman was the subject of a criminal tax investigation by a Federal grand jury. Ms. Walters knew about the investigation and presented testimony before the grand jury. The grand jury investigation never led to an indictment. As early as 1980, Ms. Walters became aware that the IRS's Criminal Investigation Division had discontinued its investigation of Mr. Gherman.

During the years 1980 through 1985, petitioners filed five petitions with the Tax Court relating to taxable years ended 1972 through 1977 and to taxable years ended 1979 through 1981. In the notices of deficiency for those years, respondent determined deficiencies in tax totaling $2,088,901. Additions to tax for fraud were determined in the notices of deficiency and affirmatively pleaded in the answers to the petitions for taxable years ended 1972 through 1975. Unreported income from an illegal activity was not in issue for years ended 1972 through 1977 or 1979 through 1981. By agreement of the parties, decisions were entered wherein deficiencies in tax for years ended 1974 through 1981, aggregating $286,126, were sustained, but additions to tax for fraud were not sustained for any taxable year asserted. On September 28, 1986, a Notice of Federal Tax Lien was filed in the Circuit Court, Dade County, Miami, Florida, which reflected an unpaid balance of assessment against petitioners for Federal income taxes for the years ended 1974 through 1979, in the aggregate amount of $818,184.16. Ms. Walters was aware of the Tax Court litigation when she signed the tax returns for the years in issue.

On December 29, 1986, Ms. Walters signed an IRS collection information statement under penalty of perjury which did not list as an investment an account at Prudential-Bache that was maintained in the name "Justice For All Inc." Funds in that

account had been transferred during December 1986 from an account with Prudential-Bache in Ms. Walters' name. Justice For All Inc. was a Florida corporation formed by Mr. Gherman to hold funds in brokerage accounts and to hold cash in bank accounts.

Tax Returns for the Years in Issue

Petitioners filed joint Federal income tax returns for tax years ended 1984, 1985, and 1986. The returns were prepared by or under the supervision of Ronnie Thaw (Mr. Thaw), a certified public accountant (C.P.A.), who had prepared tax returns for petitioners since the 1970's. The joint return for tax year ended 1984 was filed on August 19, 1985. The joint return for tax year ended 1985 was filed on August 15, 1986. The joint return for tax year ended 1986 was filed on September 21, 1987. Mr. Thaw relied on FIP's books and records to prepare petitioners' joint income tax returns for the years ended 1984 through 1986. Petitioners did not engage Mr. Thaw to verify the books or to perform a certified audit, and he did not perform those services. When the joint tax returns were prepared for tax years ended 1984 through 1986, Mr. Thaw was not aware of the CD scheme. Mr. Thaw did not include in income on those joint tax returns any moneys charged on FIP's books and records as loans to either Ms. Walters or Mr. Gherman. After the returns were prepared by their accountant, Mr. Gherman had the returns reviewed by petitioners' tax attorneys before petitioners signed

them.  Although Ms. Walters did not review their joint tax returns in depth, before she signed them she sought, and received, assurances from Mr. Gherman that everything was correctly reported on the returns because she did not want to have any more trouble with the IRS.  She knew before signing the returns that they had been prepared by a C.P.A. and reviewed by attorneys who specialized in tax matters.

On the joint returns filed for years ended 1984 through 1986, petitioners reported Form W-2 wages, income and FICA tax withholding, gross income, itemized deductions, and taxable income as follows:

| Year | Form W-2 wages (husband) | Withholding (husband) | Form W-2 wages (wife) | Withholding (wife) | Gross income | Itemized deductions | Taxable income |
|------|--------------------------|-----------------------|-----------------------|--------------------|--------------|---------------------|----------------|
| 1984 | $355,500 | $47,178 | $87,724 | $19,597 | $477,197 | $209,343 | $262,254 |
| 1985 | 512,040 | 48,374 | – | – | 498,634 | 360,411 | 134,528 |
| 1986 | 532,201 | 48,586 | – | – | 533,901 | 445,374 | 85,177 |

On the returns for those years petitioners reported that they paid interest to FIP or the FIP Pension Plan as follows:

| Year | Interest expense |
|------|------------------|
| 1984 | $67,325 |
| 1985 | 143,344 |
| 1986 | 161,422 |

Additionally, on the returns for those years, petitioners reported net losses from ShariCraig and J. Gherman Productions, an S corporation, as follows:

|       | Net losses reported | |
| Year  | ShariCraig | J. Gherman Productions |
| 1984  | $30,105    | –        |
| 1985  | 37,045     | $46,825  |
| 1986  | 4,703      | 65,567   |

In signing the joint tax returns, Ms. Walters concerned herself only with how much Mr. Gherman was earning.  Although Ms. Walters was aware of the grand jury investigation of Mr. Gherman, the Tax Court cases, and the $800,000 tax lien against Mr. Gherman and her, she did not review the entire return.  She relied on Mr. Gherman's assurances that their income tax returns accurately reflected their income.

Mr. Gherman filed separate returns for tax years ended 1987 and 1988.  His return for tax year ended 1987 was filed on July 25, 1988.  His return for tax year ended 1988 was filed on October 30, 1989.  On the separate returns filed for years ended 1987 and 1988, Mr. Gherman reported Form W-2 wages, income and FICA tax withholding, gross income, itemized deductions, and taxable income as follows:

| Year | Form W-2 Wages | Withholding | Gross income | Itemized deductions | Taxable income |
|------|----------------|-------------|--------------|---------------------|----------------|
| 1987 | $395,810       | $48,714     | $416,333     | $268,262            | $146,171       |
| 1988 | 122,067        | 37,626      | 122,067      | –                   | 117,617        |

On the separate return he filed for year ended 1987, Mr. Gherman reported that he had paid interest to FIP in an amount totaling $126,075.  Mr. Gherman claimed the standard deduction on the separate return that he filed for year ended 1988.  Additionally,

he attached to the return for that year a disclosure statement asserting that the return was substantially incomplete, because at the time of filing he had not received from Mr. Feltman information needed to prepare the return.

On audit, respondent determined that petitioners had unreported income for 1984, 1985, and 1986 of $1,540,000, $1,365,462, and $1,642,537, respectively.  Additionally, respondent determined that Mr. Gherman had unreported income for 1987 and 1988 of $1,529,500 and $1,645,000, respectively.  The notices of deficiency for the years in issue were mailed on July 19, 1991, and state that respondent's determinations were "based on information available from certificates of deposit records compiled by the bankruptcy trustee."

OPINION

Statutory Period of Limitations

Petitioners contend that assessment of the deficiency and additions to tax that respondent determined for each of the years ended 1984 through 1988 is barred by expiration of the periods of limitations under section 6501.  Respondent contends, however, that the period of limitations to assess the deficiencies and additions to tax has not expired for any year in issue.

Generally, under section 6501(a) an income tax deficiency and additions to tax must be assessed within 3 years of the later of (1) the date the tax return was filed or (2) the due date of

the return.  If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the applicable date, then the Commissioner has the burden of proving the existence of an exception to the general period of limitations.  Minahan v. Commissioner, 88 T.C. 492, 506 (1987); Stratton v. Commissioner, 54 T.C. 255, 289 (1970).

Under section 6501(e)(1)(A), the period during which the Commissioner may assess a deficiency is 6 years when a taxpayer omits from income an amount that exceeds 25 percent of the gross income required to be shown on the taxpayer's return.  The Commissioner has the burden of proving by a preponderance of the evidence that the taxpayer has omitted an amount in excess of 25 percent of the gross income required to be shown on the return. Armes v. Commissioner, 448 F.2d 972, 974 (5th Cir. 1971), affg. in part and revg. in part T.C. Memo. 1969-181; Colestock v. Commissioner, 102 T.C. 380, 383 (1994); Burbage v. Commissioner, 82 T.C. 546, 553 (1984), affd. 774 F.2d 644 (4th Cir. 1985). Where a joint return has been filed, the omission of income is considered to be a failure to report income by each spouse. Benjamin v. Commissioner, 66 T.C. 1084, 1100 (1976), affd. on another issue 592 F.2d 1259 (5th Cir. 1979).

Mr. Gherman's return for the year ended 1988 was filed on October 30, 1989.  The notice of deficiency for that year was mailed to him on July 19, 1991.  Thus, the notice of deficiency

relating to the year ended 1988 was mailed within 3 years of the time in which the return for that year was filed. The 3-year period of limitations for assessing the tax and additions to tax, consequently, did not expire for the year ended 1988 before respondent mailed the notice of deficiency relating to that year. Accordingly, the statute of limitations does not bar respondent from assessing any deficiencies in tax and additions to tax for the year ended 1988.

Respondent does not deny that the notices of deficiency for the years ended 1984 through 1987 were mailed more than 3 years after the later of the date on which the returns were filed or their due dates. Respondent contends, however, that petitioners had unreported income in the amounts of $1,540,000, $1,365,462, $1,642,537, and $1,529,500 for tax years ended 1984, 1985, 1986, and 1987, respectively. Respondent further contends that the unreported income exceeds 25 percent of the gross income of $477,197, $498,634, $533,901, and $416,333 reported in the returns for those years. Accordingly, respondent maintains, the periods of limitations for assessment of any deficiencies for 1984 through 1987 had not expired when the notices of deficiency were mailed because the 6-year period of limitations for the assessment of tax applies for those years.

Whether respondent is barred from assessing additional tax and additions to tax for the years ended 1984 through 1987 rests

on whether petitioners, for the years ended 1984 through 1986, and Mr. Gherman, for the year ended 1987, omitted from income an amount equal to more than 25 percent of the gross income reported on the returns.  We turn now to that issue.

Unreported Income

Petitioners do not deny that Mr. Gherman embezzled money from FIP's clients between 1982 and 1988, but they nevertheless contend that Mr. Gherman did not receive any unreported income, from any source, before calendar year 1988.  Petitioners further contend that Ms. Walters has never received any unreported income.  Petitioners maintain that respondent has failed to prove unreported income for the years in issue because, they contend, the schedules prepared for the 1988 bankruptcy, such as the Sweep schedule, the family disbursements schedule, and other schedules that indicate amounts purportedly owned by Ms. Walters and other family members, and on which respondent relies to prove unreported income, are not trustworthy.

Petitioners contend further that neither Mr. Gherman nor any Gherman family member benefited from the CD scheme.  Petitioners maintain that the Sweep schedule reflects that only $100,000 was payable to a Gherman family member (Ms. Walters).  Petitioners contend further that the family disbursements schedule shows that some of the funds reflected on that schedule were used to pay FIP's operating expenses while other funds were paid out as loans

and used to make investments. Petitioners also assert that Gherman family members made deposits to FIP for which no credit was made in the computation of unreported income and that no consideration was given in the computation of unreported income for stock losses. Petitioners assert that they and their children borrowed money from FIP, that they made payments of interest and principal on those loans, and that the loans and payments are reflected in FIP's books and records. Petitioners also contend that personal expenses of Mr. Gherman that FIP paid were charged to his payroll account and reported as Form W-2 income on petitioners' joint Federal income tax returns.

Respondent contends that Mr. Gherman embezzled $14.2 million from FIP's clients, consisting of the $9.8 million from the CD scheme, converted over the years 1982 through 1988, and the $4.4 million exit money with which he fled the country in August 1988. Respondent contends that there is no evidence that any valid loans existed and, furthermore, there were no consensual agreements with the investors that their funds could be used by petitioners as "loans". Respondent asserts further that the source of any funds purportedly "loaned" was money stolen from FIP's clients. Respondent additionally disputes petitioners' contention that the Gherman family members received only $100,000 from the embezzlement. Respondent contends rather that, albeit sometimes through a circuitous route, all of the embezzled funds

ultimately wound up in the FIP account over which Mr. Gherman exercised complete dominion and control. Respondent further disputes whether moneys deposited into FIP accounts by Gherman family members came from their own funds. Respondent maintains that the record does not establish that all payments of personal expenses were charged to Mr. Gherman's payroll account. Respondent contends further that FIP was a sham and that Mr. Gherman used it merely as a conduit to perpetrate his scam and to defraud his investors. Respondent asserts that Mr. Gherman had complete dominion and control over the transfer, investment, and disbursement of the embezzled funds and derived readily realizable economic value from those funds. Respondent contends that Mr. Gherman's exercise of total dominion and control over the phantom CD funds requires that the amounts be treated as additional unreported income. Accordingly, respondent contends, petitioners had unreported income from the CD scheme of at least $9,832,500; i.e., the amount reflected on the CD schedule.

We agree with respondent that petitioners had unreported income for the years in issue as a result of Mr. Gherman's embezzlement of funds from FIP's clients. Petitioners' arguments to the contrary appear based on a misunderstanding of the applicable law and of the effect of admissions made during the criminal proceeding and throughout the instant action.

Section 61 includes in income "all income from whatever source derived", including income from an illegal source. James v. United States, 366 U.S. 213, 219-220 (1961); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). It is well settled that money obtained by means of embezzlement constitutes income to the perpetrator. Money received without recognition of an obligation to repay and without restriction as to its disposition is taxable when it is received, even though the taxpayer may be required to restore the money later. James v. United States, supra; North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932); Solomon v. Commissioner, 732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. Moreover, an embezzler must include embezzled funds in income even though the funds are lent or given to another. Bailey v. Commissioner, 420 F.2d 777 (5th Cir. 1969), affg. 52 T.C. 115 (1969) (funds deposited into brother's account); Estate of Geiger v. Commissioner, 352 F.2d 221 (8th Cir. 1965), affg. T.C. Memo. 1964-153 (funds used to make loans and gifts to others); see also United States v. Lippincott, 579 F.2d 551 (10th Cir. 1978). A taxpayer restoring embezzlement income may deduct the repayment in the year repaid. James v. United States, supra at 220.

Petitioners' argument that they did not have any unreported income from embezzlement before 1988 is focused on the disposition of the embezzled money after that money was deposited

into the FIP account.  The proper focus, however, must be on Mr. Gherman's unauthorized diversions of funds from the accounts of FIP's clients into the FIP account.  Those unauthorized diversions constitute the taxable events, and not Mr. Gherman's subsequent use of the embezzled funds, whatever that use might have been.  See Bailey v. Commissioner, supra; Estate of Geiger v. Commissioner, supra.

Mr. Gherman admitted during the criminal proceeding that he had embezzled approximately $9.7 million from FIP's clients.  It is well settled that a judgment of conviction in a criminal prosecution is admissible in evidence in a subsequent civil action which is based on the act for which the conviction was rendered.  Fed. R. Evid. 803(22).  Mr. Gherman's guilty plea in the criminal proceeding, furthermore, is a confession of truth to the charges and is admissible in the instant action as his admission that he in fact embezzled funds from FIP's clients. Fed. R. Evid. 801(d)(2).

Additionally, petitioners do not challenge the accuracy of the amounts listed in the CD schedule, prepared from FIP's books and records, nor do they deny that Mr. Gherman exercised total control over the embezzled funds.  Petitioners, furthermore, do not challenge respondent's allegation that Mr. Gherman embezzled the $9,832,500 reflected on the CD schedule.  Rather, petitioners contend that Mr. Gherman did not receive any unreported income

until 1988 because the embezzled funds were not disbursed directly to Gherman family members but were funneled into the FIP account and used to pay FIP's operating expenses or were used to make loans to Gherman family members or other individuals or were used to make investments. We do not agree. Mr. Gherman received, and should have included on his tax returns, income from embezzlement at the time he converted the funds from the accounts of FIP's clients. See James v. United States, supra; Estate of Geiger v. Commissioner, supra. Accordingly, we sustain respondent's position that petitioners received unreported income from embezzlement for the years in issue. However, we believe that some adjustment is required in the amount of unreported income determined in the notices of deficiency.

Computation of Unreported Income

We begin our computation of unreported income for the years in issue with the amounts reflected on the CD schedule for those years, which petitioners do not challenge. We use the net amount reflected for each year to account for embezzled funds that were returned to accounts of FIP's clients. The repayments to accounts of FIP's clients appear to be an integral part of the CD scheme. The repayments helped to perpetuate the fraud over a number of years. Consequently, we treat them as expenses of the illegal activity. Additionally, for the year ended 1988, we exclude any withdrawal from, or repayment to, a client account

with a transaction date after Mr. Gherman fled the country.  We are not persuaded that either Mr. Gherman or Ms. Walters exercised any dominion or control over those funds.  We further reduce the net amounts reflected on the CD schedule by the purported interest paid to CD participants.  Those payments also appear to be an integral part of the CD scheme and helped to perpetuate the fraud and are accordingly treated as an expense of the illegal activity.

Additionally, we reduce the net amounts reflected on the CD schedule by amounts that we believe petitioners already included in income in the form of Form W-2 wages from FIP.  FIP paid wages to Mr. Gherman for all of the years in issue and to Ms. Walters for year ended 1984, which petitioners reported on their tax returns.  A portion of the wages paid to petitioners by FIP would have been paid from gross receipts.  For each of the years in issue, however, FIP operated at a loss.  Mr. Gherman used a portion of the embezzled moneys to fund FIP's operations, including petitioners' salaries.  Consequently, for each year we reduce the net amount embezzled by the lesser of the Form W-2 wages reported on the return or FIP's reported net operating loss.  Accordingly, we hold that the unreported income (rounded) for the years in issue is as follows:

|  | Year | | | | |
|  | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|
| Net amount per CD Sch. | $1,575,000 | $1,161,163 | $1,752,537 | $1,708,500 | $1,525,300 |
| Less: Invoices dated after 8/88 | -0- | -0- | -0- | -0- | 155,300 |
| Interest paid to CD participants | 304,864 | 282,452 | 406,917 | 484,548 | -0- |
| Lesser of W-2 wages or FIP's NOL | 251,665 | 233,033 | 532,201 | 395,810 | 122,067 |
| Unreported income | 1,018,471 | 645,678 | 813,419 | 828,142 | 1,247,933 |

For each of the years 1984 through 1987, the unreported income exceeds 25 percent of the income reported on the return. Accordingly, we conclude that for each of those years the statute of limitations does not bar the assessment of the deficiency or additions to tax.

Addition to Tax for Negligence

Respondent determined that petitioners are subject to an addition to tax for negligence under section 6653 for the years in issue.

Section 6653(a)(1) (for 1984, 1985, and 1988) or section 6653(a)(1)(A) (for 1986 and 1987) imposes an addition to tax equal to 5 percent of the underpayment if any part of the deficiency was due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) (for 1984 and 1985) or section 6653(a)(1)(B) (for 1986 and 1987) provides for an addition to tax in the amount of 50 percent of the interest

payable on the portion of the underpayment of tax attributable to negligence.

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code. Sec. 6653(a)(3). Negligence also has been defined as a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. See Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners have the burden of proving that the deficiency was not due to neglect or the intentional disregard of rules or regulations. Rule 142(a); Neely v. Commissioner, supra.

Petitioners did not address this issue in their brief nor did they present any evidence at trial which would prove that the omission of income was not due to negligence or the intentional disregard of rules or regulations. Accordingly, we sustain respondent's determination as to the additions to tax under section 6653(a).

Addition to Tax for Substantial Understatement of Tax

Respondent determined that petitioners are liable for additions to tax for the substantial understatement of their tax liability for the years in issue.

Section 6661 imposes an addition to tax of 25 percent (10 percent for assessments made before October 22, 1986) of any

underpayment attributable to a substantial understatement of tax. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). A substantial understatement of income tax is defined as an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the return for the year or $5,000, whichever is greater. Sec. 6661(b)(1)(A). An understatement is the amount required to be shown on the return less the amount actually shown on the return. Sec. 6661(b)(2)(A). The Commissioner may waive the addition to tax if the taxpayer had reasonable cause for the understatement and acted in good faith. Sec. 6661(c). Petitioners bear the burden of proving that respondent's imposition of additions to tax under section 6661 is erroneous. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).

Petitioners did not address this issue in their brief, nor did they present any evidence at trial which would prove that they had reasonable cause for the understatement and acted in good faith in omitting the income from their returns. Accordingly, we sustain respondent's determination as to the additions to tax under section 6661.

Addition to Tax for Failure To Timely File

Respondent determined that Mr. Gherman is liable for the addition to tax imposed under section 6651(a)(1) for the year ended 1988, because he failed to timely file his Federal income

tax return for that year and he did not prove that the failure to timely file was due to reasonable cause.

Section 6651(a)(1) imposes an addition to tax of 5 percent of the amount of the tax due for each month a return is delinquent, up to a maximum of 25 percent.  The addition to tax is not applicable if it is shown that the failure is due to reasonable cause and not willful neglect.  Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985).  Petitioner has the burden of proving that his failure to file was due to reasonable cause and not to willful neglect.  Niedringhaus v. Commissioner, 99 T.C. 202, 220-221 (1992); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985).  To prove "reasonable cause", taxpayers must show that they exercised ordinary business care and prudence and were nevertheless unable to file the return within the statutorily prescribed time.  Crocker v. Commissioner, supra at 913; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Taxpayers may, generally, establish reasonable cause by proving that they reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return and later found that the advice was erroneous or mistaken.  United States v. Boyle, supra at 250; Estate of Paxton v. Commissioner, 86 T.C. 785, 820 (1986).

Mr. Gherman did not address this issue on brief, nor did he present any evidence at trial which would prove that he had reasonable cause for failing to timely file his return for year

ended 1988.  Accordingly, we sustain respondent's determination as to the addition to tax under section 6651(a)(1).

Innocent Spouse Relief

Petitioners contend that Ms. Walters qualifies for relief under the innocent spouse provisions of section 6013(e) from liability for the deficiencies and additions to tax determined for years ended 1984, 1985, and 1986 (the applicable years). Respondent contends, however, that Ms. Walters is not entitled to relief under section 6013(e).

Spouses who file a joint income tax return generally are jointly and severally liable for its accuracy and the tax due, including any additional taxes, interest, or additions to tax determined on audit of the return.  Sec. 6013(d)(3).  However, pursuant to section 6013(e), a spouse can be relieved of tax liability if that spouse shows that he or she qualifies as an "innocent spouse".  To qualify as an innocent spouse under section 6013(e), a taxpayer must prove:  (1) He or she filed a joint return for the years in issue; (2) there is a substantial understatement of income tax attributable to grossly erroneous items of the other spouse on the return; (3) he or she did not know or have reason to know of the substantial understatement when the return was signed; and (4) it would be inequitable to hold the "innocent" spouse liable for the deficiency attributable to the substantial understatement.  Sec. 6013(e)(1).  Failure to meet any of the requirements precludes a taxpayer from qualifying

as an innocent spouse.  Sec. 6013(e)(1); <u>Purcell v. Commissioner</u>, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); <u>Shea v. Commissioner</u>, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. and remanding T.C. Memo. 1984-310; <u>Bokum v. Commissioner</u>, 94 T.C. 126, 138-139 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

Respondent concedes that joint returns were filed for the applicable years and that the tax involved is the result of grossly erroneous items.  Petitioners must prove, however, that Ms. Walters satisfies the remaining criteria for relief under section 6013(e).

<u>Grossly Erroneous Item of the Other Spouse</u>

Respondent contends that funds derived from the CD scheme are income also attributable to Ms. Walters.  Respondent maintains that Ms. Walters had control over the embezzled funds sufficient to make the income attributable to her as well as to Mr. Gherman because she cosigned FIP's checks.  Accordingly, respondent maintains, Ms. Walters does not qualify for relief under the innocent spouse provisions.

Respondent's arguments are not persuasive.  The fact that Ms. Walters cosigned FIP's checks, attended board of directors meetings, and held all of FIP's stock in her name might have been determinative had the unreported income resulted from an understatement of the income earned by FIP or an overstatement of the deductions claimed by FIP.  The unreported income, however,

arose from embezzlement of funds from accounts of FIP's clients. As we discussed supra, the embezzlement occurred when Mr. Gherman converted funds from various accounts of FIP's clients, not when those funds subsequently were deposited into or disbursed from the FIP account. Ms. Walters had no control over the accounts of FIP's clients. She was not a participant in the embezzlement of funds from those accounts.

Moreover, if control over the FIP account was determinative, we are convinced that Ms. Walters did not exercise that control. Ms. Walters signed blank checks in large numbers. Mr. Gherman's signature, however, also was required on all of the checks before they became valid. Ms. Walters made no decisions as to when or where the funds would be used. Mr. Gherman alone made the decisions relating to the disbursement of funds from the FIP account. Additionally, Mr. Gherman alone embezzled the funds and he alone knew that money from accounts of FIP's clients was being diverted into the FIP account. Mr. Gherman alone made all financial decisions relating to the use of those diverted funds. Accordingly, we hold that the unreported income is attributed solely to Mr. Gherman. See Feldman v. Commissioner, 20 F.3d 1128, 1136-1137 (11th Cir. 1994) (the test for whether an item is attributable to a spouse is whether the spouse has sufficient connection through ownership rights or otherwise to make it an item for which both spouses should bear responsibility), affg. T.C. Memo. 1993-17.

Knowledge of the Understatement

Petitioners contend that Ms. Walters had no actual or constructive knowledge of the embezzlement income before or during the applicable years.  Respondent does not agree.

To establish lack of knowledge of the understatement, Ms. Walters must show that she was unaware of the circumstances giving rise to the omission of income.  See Park v. Commissioner, 25 F.3d 1289, 1294 (5th Cir. 1994) ("Courts have generally agreed that in innocent spouse cases involving the omission of income, relevant inquiry is whether the spouse claiming innocent spouse relief knew or should have known of an income-producing transaction that the other spouse failed to report in their joint return."), affg. T.C. Memo. 1993-252; Purcell v. Commissioner, 86 T.C. at 238.  She must show that she lacked both actual knowledge and constructive knowledge of the omission such that a reasonably prudent person under the circumstances at the time that the return was filed could not be expected to know that the tax liability stated was erroneous or that further inquiry was necessary.  See Stevens v. Commissioner, 872 F.2d 1499, 1504-1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Sanders v. United States, 509 F.2d 162, 167 (5th Cir. 1975).  Whether the spouse seeking relief had reason to know of the substantial understatement is a question of fact to be determined after reviewing the entire record.  Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990), affg. T.C. Memo. 1987-522.

Where omissions from income are in issue, courts generally agree that it is actual or constructive knowledge of the underlying transactions, not of the tax consequences of those transactions, that is material. Park v. Commissioner, supra at 1293-1294. However, the failure to review a tax return generally does not absolve a taxpayer of liability. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228. A taxpayer may not generally close his or her eyes to what is disclosed on the tax return and plead ignorance. Edmondson v. Commissioner, T.C. Memo. 1996-393; Cohen v. Commissioner, T.C. Memo. 1987-537. Nonetheless, while a spouse cannot close his or her eyes to unusual or lavish expenditures, the spouse is not required to have perfect knowledge of family financial matters. Belk v. Commissioner, 93 T.C. 434, 441 (1989); Mysse v. Commissioner, 57 T.C. 680, 699 (1972). Furthermore, "one person's luxury may be another's necessity, and the lavishness of an expense must be measured from each family's relative level of ordinary support." Kistner v. Commissioner, 18 F.3d 1521, 1525 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463; see also Sanders v. United States, supra at 168. However, "the alleged innocent spouse's role as a homemaker and complete deference to the spouse's judgment concerning the couple's finances, standing alone, are insufficient to establish that a spouse had no 'reason to know.'" Kistner v. Commissioner, supra at 1525; see also Stevens v. Commissioner, supra at 1505.

We are persuaded that Ms. Walters did not know that Mr. Gherman was embezzling money from FIP's clients until 1988, after he fled the country and after the returns for the applicable years were filed. Mr. Gherman did not tell Ms. Walter that he was embezzling money from the accounts of FIP's clients. The embezzled funds, furthermore, did not go into the Joan Gherman No. 1 account, over which she had control, but into the FIP account, over which she exercised no supervision. Although Ms. Walters attended monthly board meetings of FIP, it is unlikely that the embezzlement of funds from accounts of FIP's clients was a topic of discussion at those meetings. Even Mr. Feltman, the trustee for the 1988 bankruptcy, became convinced after a lengthy investigation of the CD scheme that Ms. Walters was unaware of the embezzlement until after Mr. Gherman fled the country. Accordingly, we conclude that at the time the tax returns for the applicable years were filed, Ms. Walters had no actual knowledge of the transaction giving rise to the unreported income--the embezzlement of funds from the accounts of FIP's clients.

Additionally, we are persuaded that Ms. Walters had no reason to know that Mr. Gherman was embezzling money from the accounts of FIP's clients. Ms. Walters was a high school graduate and was basically ignorant of tax, financial, and accounting principles. Mr. Gherman's financial affairs were complex, and Ms. Walters had very little to do with them. The CD scheme continued over a number of years and deceived many

individuals more financially astute than Ms. Walters.  We are convinced that Mr. Gherman also managed to convince Ms. Walters and other family members that the family "fortune" came from his financial expertise.

Respondent contends further that Ms. Walters should have known about the unreported income, because the income reported on petitioners' tax returns for the applicable years could not support their lifestyle.  Beyond general references to petitioners' "level of expenditures", information about their personal residence, the use of household help, and their use of the Camelot, the record is vague as to the nature of Ms. Walters' standard of living during 1984, 1985, and 1986.  Consequently, it is not clear whether petitioners' reported gross income of $477,197, $498,634, and $533,901 for 1984, 1985, and 1986, respectively, could have supported that lifestyle.  Nonetheless, having observed Ms. Walters at trial and having heard her testimony and considering the circumstances, we are persuaded that Ms. Walters believed the reported income for those years was sufficient to support their lifestyle.

Ms. Walters did not sign blank tax returns.  She reviewed the returns at least to the point of checking to ascertain how much money Mr. Gherman was earning.  Consequently, she was aware that petitioners reported gross income of close to half a million dollars for each of the applicable years.  We are persuaded that, in light of her limited education and lack of business expertise,

the high amount of gross income reported on the returns caused Ms. Walters to assume that their reported income was sufficient to support their standard of living.

Furthermore, petitioners began moving up into better homes and neighborhoods, had household help, threw elaborate parties, and otherwise enjoyed a fairly high, and generally improving, standard of living years before Mr. Gherman began embezzling money from FIP's clients. The house in which petitioners lived during the years in issue was purchased in 1981 or 1982, before that Mr. Gherman began embezzling money from FIP's clients. Mr. Gherman made all decisions relating to financial matters that affected both FIP and petitioners. Except for some minor household expenditures that were paid out of the Joan Gherman No. 1 account, Mr. Gherman or a member of his office staff paid petitioners' personal bills from the FIP account or the Joan Gherman No. 2 account. Ms. Walters signed checks drawn on those accounts in blank. Furthermore, she did not balance any of the checking account statements. Consequently, we are persuaded that Ms. Walters had no reason to suspect that their lifestyle exceeded their reported income, if it did. See Sanders v. United States, 509 F.2d at 168.

Respondent contends further that Ms. Walters' show business activities demonstrate that she lived extravagantly during 1984 through 1986. The show business activities addressed at trial, e.g., her producing "Purlie" and "Bubbling Brown Sugar" and her

managing Barry Smith, the Freeman Sisters, and Patti Jo, took place during the 1970's. Inasmuch as those show business activities preceded the embezzlement, they do not support respondent's position.

Additionally, not all of the embezzled money flowed directly to Gherman family members. Mr. Gherman used a portion of the embezzled funds to pay FIP's operating expenses and to make loans and investments. Mr. Gherman alone controlled FIP's operations. Large sums of money flowed through the FIP account at any time. Although Ms. Walters attended board of director meetings, her role in FIP's operations was to sign checks in blank and to help entertain clients, not to control how the funds were to be used. We are persuaded that her minimal participation in the activities of FIP did not provide her sufficient facts such that a reasonably prudent taxpayer in her position would be put on notice of the embezzlement income or of a need to make further inquiry.

Respondent contends further that Ms. Walters had reason to inquire as to whether Mr. Gherman was properly reporting all income because he had been denied a discharge in the 1969 bankruptcy as a result of false statements that he had made to a lender, Mr. Gherman had been investigated by a Federal grand jury relating to tax crimes, and Ms. Walters had been involved in Tax Court litigation relating to the joint tax returns that she had filed with Mr. Gherman which resulted in a tax liability in

excess of $800,000. Respondent asserts that Ms. Walters nevertheless made no attempt to ascertain that the joint tax returns were true and correct. We disagree with respondent, for several reasons.

First, FIP's clients generally were well-educated, successful professional business men and women who remained clients of FIP for many years. Mr. Gherman did not keep secret from FIP's clients the fact that he was not discharged in the 1969 bankruptcy. Nonetheless, FIP's clients relied on Mr. Gherman's advice and trusted him to handle their financial affairs honestly and fairly. Similarly, we are persuaded that Mr. Gherman's failure to obtain a discharge in the 1969 bankruptcy would not cause Ms. Walters to suspect that Mr. Gherman was embezzling money from FIP's clients.

Second, the embezzlement of millions of dollars from accounts of FIP's clients was not related or even similar to the activities cited by respondent. None of those prior activities, furthermore, resulted in a criminal indictment. Moreover, the prior audits of petitioners' tax returns did not involve the failure to report income from an illegal activity and those audits were settled with respondent's conceding the imposition of additions to tax for fraud as well as a substantial portion of the deficiencies. Ms. Walters knew that the IRS had dropped its fraud investigation of Mr. Gherman and that the grand jury did not bring an indictment against him. Under those circumstances,

we believe that the prior audits and grand jury investigation would not cause Ms. Walters to suspect that Mr. Gherman was embezzling money from the accounts of FIP's clients.

Third, during 1984, Ms. Walters requested that she be removed from FIP's payroll because she wanted to avoid trouble in the future with the IRS.  Furthermore, Ms. Walters knew that following the audits and the grand jury investigation, the accountants who prepared the tax returns for FIP and petitioners began to take a closer look at large and extraordinary items, especially expense items, reported on the tax returns and that after they were prepared, the returns were reviewed by attorneys who specialized in tax matters before being presented to petitioners for their signature.  We are persuaded that, as far as Ms. Walters knew, she had taken appropriate action to assure herself that the returns were proper and correct.

Finally, we do not agree that Ms. Walters blindly accepted petitioners' tax returns.  While she may not have reviewed the returns in depth, Ms. Walters knew that the returns had been prepared by a C.P.A. and then reviewed and approved by attorneys who specialized in tax matters before the returns were given to petitioners for signature.  Furthermore, Ms. Walters sought and received assurances from Mr. Gherman that the returns were properly prepared before she signed them.  Accordingly, we are persuaded that Ms. Walters satisfied her duty to inquire as to the accuracy of the joint tax returns.

Consequently, we conclude that Ms. Walters had not been put on notice that embezzlement income was being unreported or that further inquiry was needed.

As we stated earlier, we are not faced with a situation where income earned by FIP was understated or deductions claimed by FIP were overstated on its tax returns. If we were, we agree that Mr. Gherman's prior activities and difficulties might have put Ms. Walters on notice that further inquiry as to unreported income was necessary. But FIP's income and deductions are not the issue. In our view, under the circumstance of the instant case, Mr. Gherman's prior activities are not relevant to the issue of whether Ms. Walters had reason to know that Mr. Gherman was stealing money from accounts of FIP's clients.

On the basis of the foregoing, we conclude that Ms. Walters had neither actual nor constructive knowledge of the embezzlement. See Park v. Commissioner, 25 F.3d at 1293-1294. Accordingly, we hold that Ms. Walters did not know, nor did she have reason to know, about the unreported income.

Inequitable To Hold Liable for Tax

Petitioners contend that it would be inequitable to hold Ms. Walters liable for the deficiencies in tax and additions to tax. Respondent disagrees.

Whether it is inequitable to hold a person liable for additional tax, interest, and additions to tax is to be determined on the basis of all the facts and circumstances. Sec.

6013(e)(1)(D); Flynn v. Commissioner, 93 T.C. 355, 367 (1989); sec. 1.6013-5(b), Income Tax Regs. A factor to be considered is whether the purported innocent spouse significantly benefited beyond normal support, either directly or indirectly, as a result of the unreported income. Hayman v. Commissioner, 992 F.2d at 1262; Belk v. Commissioner, 93 T.C. at 440; Purcell v. Commissioner, 86 T.C. 228, 242 (1986); sec. 1.6013-5(b), Income Tax Regs. Normal support is determined by the circumstances of the taxpayers. See Sanders v. United States, 509 F.2d at 168; Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Flynn v. Commissioner, supra. Petitioners bear the burden of proving that Ms. Walters received no significant benefit from the understatement other than normal support, and that burden must be satisfied with specific facts regarding lifestyle, expenditures, asset acquisitions, and the disposition of the benefits of the understatement. See Bokum v. Commissioner, 94 T.C. at 157; Estate of Krock v. Commissioner, supra.

Petitioners contend that Ms. Walters did not benefit significantly from the unreported income but rather received merely ordinary support that was commensurate with the upper middle class lifestyle that petitioners had maintained before the embezzlement. They assert that Ms. Walters herself was not extravagant in her spending habits. Petitioners contend further that the Camelot benefited FIP through the entertainment of its clients and does not demonstrate an extravagant lifestyle. They

contend further that the income reported on their joint returns for years ended 1984 through 1986 was sufficient to support their lifestyle.

Respondent contends that it is not inequitable to hold Ms. Walters liable for the deficiency attributable to the substantial understatement, because she benefited from the income above normal support and she helped Mr. Gherman obtain the unreported income through her ownership of FIP. As examples of significant benefits from the unreported income, respondent cites the Eastern Shores house, the purchase and use of the Camelot, her show business endeavors, lavish gifts to her children and grandchildren, parties and other entertainment, and personal investments and bank accounts. Additionally, respondent contends that Ms. Walters benefited from the embezzlement because Mr. Gherman used some of the stolen funds to pay off major debts of Ms. Walters, such as her automobile and Federal income tax liabilities.

We have been provided with few specific facts relating to petitioners' lifestyle, expenditures, and asset acquisitions and dispositions for the years 1984 through 1986. See Bokum v. Commissioner, supra at 157; Estate of Krock v. Commissioner, supra. To a large extent, the specific facts regarding petitioners' lifestyle, spending habits, and asset acquisitions and dispositions revealed in the record relate to years before or after the applicable years.

The record establishes that Mr. Gherman funneled embezzled funds through the FIP account. The record also shows that during the 1970's he used FIP funds to subsidize Ms. Walters' show business endeavors, but it appears, and we so find, that Ms. Walters did not undertake any show business activities during 1984 through 1986, and none of FIP's money, including embezzled funds, went to support those activities.

It is possible, and for purposes of deciding the issue we assume, that Ms. Walters benefited from the unreported income to some extent above normal support. Nonetheless, under the circumstances, we find that the fact that she did so benefit is not determinative because other factors outweigh any benefit she may have received.

Whether a spouse substantially benefited from the unreported income is only one factor to consider in determining whether it is inequitable to hold the spouse liable for the deficiencies and additions to tax. An additional factor to consider is whether the spouse claiming relief was deserted, divorced, or separated. Kistner v. Commissioner, T.C. Memo. 1995-66; sec. 1.6013-5(b), Income Tax Regs. We also may consider whether the spouse seeking relief will suffer undue hardship as a result of being held liable for the deficiencies if relief is denied. See Sanders v. United States, supra at 171; Dakil v. United States, 496 F.2d 431, 433 (10th Cir. 1974).

Ms. Walters and Mr. Gherman were divorced during 1989. Mr. Gherman is in jail, serving a 30-year sentence. As far as we know, he does not have the financial resources to pay the deficiencies and additions to tax, nor does he have the means to obtain those resources. Ms. Walters also lacks the financial resources to pay the deficiencies and additions to tax. Because of the 1988 bankruptcy, Ms. Walters walked away from her marriage with no personal assets. She is living in her daughter's apartment and can scarcely support herself. Additionally, as a 63-year old woman with only a high school education and a low-paying job, there is little likelihood that Ms. Walters will ever be able to amass the funds needed to pay the deficiencies and additions to tax. Consequently, she would suffer undue hardship should relief be denied.

Ms. Walters did not participate in the embezzlement of funds from the accounts of FIP's clients, nor did she assist in the embezzlement, as respondent contends, because she allowed Mr. Gherman to use her name to conduct business. To accept respondent's contention that Ms. Walters aided and abetted the embezzlement because she allowed Mr. Gherman to organize and operate FIP under her name, we would have to believe that Mr. Gherman, with Ms. Walters' knowledge and consent, planned to defraud FIP's clients at the time that FIP was organized during 1969 and then waited until the end of 1982 to effectuate that plan. Respondent's position defies common sense and is not

supported by the record.  Although she did allow Mr. Gherman to use her name in order to conduct business, there is no suggestion that Ms. Walters did so with the understanding that criminal activities would occur.  Indeed, as far as we know, during the first 13 years of FIP's existence, no conversion of client funds occurred.

Under the circumstances, we conclude that it would be inequitable to hold Ms. Walters liable for the deficiencies and additions to tax.  Accordingly, we hold that Ms. Walters is entitled to relief under section 6013(e) as an innocent spouse.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.